[1] This suit involves an accident which occurred when a motor vehicle ran into a winch cable stretched across the highway.
[2] The undisputed facts are essentially as follows. On January 3, 1974, Green, the defendant, was driving his 1972 American Motors Jeep on Louisiana Highway 175 about 5 miles north of Mansfield, Louisiana, and saw an unattended pickup truck mired in the ditch. He felt the hood, which was warm, and concluded that the driver had gone for help. He decided to volunteer his assistance in pulling it from the ditch.
[3] After hooking his winch cable to the vehicle, Green backed his Jeep across the *West Page 849 
highway onto the opposite shoulder of the roadway, thereby pulling the cable taut and ultimately raising the stuck vehicle from the ditch up to a position where it would stay on its respective shoulder of the road. Upon completion of this operation, the winch cable was stretched across the highway about 12 inches above its surface. Green shut off his motor, and sometime later he saw Page's 1974 GMC pickup truck approaching from the north. Green realized he had not placed any flags on the cable or any warning signs on the ground up the highway. He jumped from the Jeep on the south side of the cable, the side opposite from the approaching Page vehicle, and began to wave his arms overhead in an effort to alert its driver to the danger. Page saw the vehicles on each side of the highway, and he saw Green waving his arms. However, whether Green actually moved into the middle of the roadway to wave his arms, and exactly when he dismounted from the Jeep are in dispute. Page reduced his speed but did not become aware of the cable stretched across the roadway until it was too late to avoid the accident. Green decided that the accident was inevitable when the Page truck was a short distance from the cable and ran from the highway in a southeast direction, i. e., in the opposite direction from which Page was coming.
[4] The force of the collision between the Page truck and the cable swung the Jeep from the shoulder of the road into the highway resulting in a second collision between it and the Page truck producing personal injuries to Page and damage to his truck.
[5] There were, of course, some variations in the witnesses' testimony. Page contends it was foggy at the time of the accident. He testified he had been driving about 60 miles per hour when he entered a low area or a patch of fog in which his visibility was reduced to about 100 feet in front of his vehicle. At this time he lowered his speed to about 50 miles per hour. He saw a Jeep on the left side of the road and a pickup truck on the right. When he was about 75 feet from them, a man jumped out of the Jeep, started waving his arms, pointed to the road, and ran away from the Jeep. Page testified that the man did not come into the middle of the highway, and that he did not notice the cable stretched between the vehicles until he was 12 or 13 feet from it. Page slammed on his brakes as soon as he saw the cable.
[6] Green stated the accident occurred shortly after 9:30 A.M. on a clear day. The road was dry, it had not rained, and there was no fog or mist. He testified he first saw the Page truck when it was 1,450 feet away and estimated it was traveling 75-80 miles per hour. However, as it approached the scene, Green testified, the Page truck slowed to about 50 to 55 miles per hour. All during this time, Green contended, the emergency flasher lights were pulsating on the sides and front of his Jeep. When the Page truck got to a little hill about 2/10ths of a mile from him, Green said he got out of the Jeep and stepped to the middle of the highway in order to wave his arms. At one point, Green testified that Page made no attempt to actually stop until he was either 15 or 20 feet from the cable. But he later said Page was 50 feet from the cable when he locked his wheels and skidded into it. According to Green, when Page was asked why he didn't stop sooner, Page said, "I didn't know what you wanted." When asked to describe the appearance of the winch cable, Green stated that it was "darkish, but shiny".
[7] State Trooper F. E. Lambert said the accident wasn't reported until 10:25 A.M. and he arrived at 11:05 A.M. The trooper did not observe any skidmarks. The road was wet, according to him, and it was raining at that time. He said the rain was a "general rain". However, it was not foggy at the time he arrived, he testified, although it could have been earlier. At the time the trooper arrived, James Harris, the owner of the third vehicle which had been stuck in the ditch, was also there and he said to the trooper: "We were trying *West Page 850 
to get my truck out of the ditch." Apparently he was never asked to explain this remark or subpoenaed as a witness in the case.
[8] The trial court judge ruled for the defendant primarily for two reasons: (1) the physical presence of the Jeep and the Harris vehicle on the shoulders of the road, plus Green's waving his arms, required Page to bring his truck under control to the extent that he could make an immediate stop; and (2) Page failed to carry the burden of proof required of him in the case. We disagree and reverse the judgment of the District Court.
[9] Obviously, the accident would not have occurred but for the obstruction of the highway by Green, and his act of stretching the winch cable across the highway was a cause in fact of the accident.
[10] However, if the defendant's conduct of which the plaintiff complains is a cause in fact of the harm, we are then required in a determination of negligence to ascertain whether the defendant breached a legal duty imposed to protect against the particular risk involved. Hill v. Lundin Associates, Inc., 260 La. 542,256 So.2d 620 (1972); Pierre v. Allstate Insurance Company,257 La. 471, 242 So.2d 821 (1970). See Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin Associates, Inc., 34 La.L.Rev. 1 (1973).
[11] Green's alleged misconduct, or breach of duty, was in stretching the winch cable across the highway about one foot above its surface, without first stationing signs, flares or some device to warn approaching motorists of the hazard. It is well settled that the Department of Highways and other governmental agencies which obstruct or create other hazards in thoroughfares for purposes of construction, repair or maintenance must give warning to the motoring public commensurate with the danger involved. Christ v. State, La.App., 161 So.2d 322 (3d Cir. 1964); Reeves v. State, La.App., 80 So.2d 206 (2d Cir. 1955); Kilpatrick v. State, La.App., 154 So.2d 439 (2d Cir. 1963); Pierrotti v. Louisiana Department of Highways, La.App.,146 So.2d 455 (3d Cir. 1962); Carlisle v. Parish of East Baton Rouge, La.App., 114 So.2d 62 (1st Cir. 1959); Smith v. State Through Dept. of Highways, La.App., 87 So.2d 380 (1st Cir. 1956); Dowden v. State, La.App., 81 So.2d 48 (2d Cir. 1955); Cf. LeBlanc v. Parish of East Baton Rouge, La.App., 271 So.2d 634 (1st Cir. 1972). Therefore, it is reasonable to conclude that private citizens, being under no obligation to maintain the highways, have a duty to meet a standard of care at least equal to that required of governmental employees, when they create obstructions or other perilous conditions in the highways.
[12] Green took no measures to warn motorists of the hazard he had created other than to activate the emergency flasher lights on his Jeep, which was parked completely off the highway, and to wave his arms just prior to Page's arrival at the accident scene. Considering that the winch cable, an object not usually encountered in the roadway, was difficult to see and presented an extreme danger to highway users, we find that these warnings were woefully inadequate, and that Green breached his legal duty to give warning commensurate with the danger presented. We also conclude that the risk encountered by the plaintiff which caused his harm was one against which the legal duty was imposed to protect and therefore determine that Green was guilty of negligence which caused the accident.
[13] Nevertheless, the trial court decided that, although the warning given by Green was inadequate to absolve him from negligence, it was sufficient to place upon Page a legal duty to retard the speed of his vehicle "to the point he could make an immediate stop." In barring Page's recovery for failure to perform his duty, the trial court indicated that Page had not carried the burden *West Page 851 
of proof to demonstrate that he was free of contributory negligence.
[14] The trial court should have placed the burden of proving contributory negligence on the defendant. He who relies upon contributory negligence bears the burden of proving the facts which justify application of this special defense. LeJeune v. State, La.App., 215 So.2d 150 (3d Cir. 1968); Deshotels v. Southern Farm Bureau Casualty Insurance Company, 245 La. 23,156 So.2d 465 (1963); Jones v. Continental Casualty Company of Chicago, Illinois, 246 La. 921, 169 So.2d 50 (1964). Thus, in this case, Green, in order to avail himself of the defense, should have been required to prove that Page's conduct of which Green complained was a cause in fact of the accident, that it was a breach of a legal duty placed upon Page, and that the duty was imposed to protect against the particular risk from which the accident resulted.
[15] It is clear that the conduct complained of, Page's failure to stop his truck before it collided with the winch cable, was a necessary antecedent to, and therefore a cause in fact of, the accident.
[16] Whether a legal duty was imposed on Page by the actions of Green preceding the accident depends on whose version of the facts is accepted. Page testified that he was only 75 feet from the Jeep when Green alighted from it, waved his arms, pointed to the road, and ran off in the opposite direction. Page stated that Green did not come into the roadway. If Page is to be believed, no meaningful legal duty was imposed on him regarding the stopping of his vehicle because by the time he received any real warning of the hazard it was too late for him to avoid striking the cable.
[17] We are inclined to accept Page's version because we detected implausible features in Green's testimony. In the beginning of the episode, we found it strange that Green would without request pull the vehicle of an absent and unknown person from the ditch, thereby risking liability in the event of damage to the vehicle. Next, there is the conflict between what Green and Harris told the police officer about whether Harris was present at the time of the accident. Finally, Green testified that he saw the Page truck coming when it was 1,450 feet away. If this was so, it is difficult to understand why he did not use the time available to him to allow the cable to go slack, thereby removing the hazard, or to run up the road in an effort to flag down the approaching truck before it reached the obstruction. His explanation for not taking the latter course was that he feared for his personal safety. Yet, he placed himself in much greater danger if, as he testified, he stood in the middle of the highway until the oncoming Page truck was 50 feet from the cable.
[18] We are reluctant, however, to substitute our assessment of the credibility of the witnesses for that of the trial judge, because he saw and heard them testify. Nevertheless, if we accept Green's version of the facts instead of Page's, the result of the proceedings below still appears incorrect. We agree that, under Green's version, when he stepped into the roadway and waved his arms, a legal duty was imposed on Page to reduce his speed and to prepare to take action to avoid dangers that a reasonable person would anticipate under the circumstances. But was Page under a legal duty imposed to protect against the particular risk involved, i. e., striking a winch cable stretched across the roadbetween the Page truck and the man in the highway waving his arms?
[19] Page testified that he first saw the winch cable when he was 12 or 13 feet from it. There is no evidence that Page should have seen it any sooner than he did. On the contrary, we are convinced from the testimony of Page and the policeman that the weather was inclement, making the "darkish, but shiny" cable visible only at close range. There was nothing in Green's actions to indicate that the danger *West Page 852 
of which he gave warning lay between him and Page. It would have been more reasonable for Page to think he was being alerted to a hazard down the road beyond Green, or perhaps, to the possible danger of a person or animal running into the highway from behind one of the parked vehicles. In fact, under the circumstances, rather than think he was being warned of anything, it would have been equally reasonable for Page to assume that Green merely wanted help with one of the parked vehicles, or even that Green, whom he did not know, intended him some foul play.
[20] Therefore, a duty was imposed on Page to protect against possible hazards located down the highway beyond Green or lurking behind one of the parked vehicles. However, the actions of Green and other surrounding circumstances did not create a legal duty on the part of Page to take precautions against colliding with an all but invisible hazard before he reached the spot at which Green was standing. Thus we hold that Page was not under a legal duty imposed to protect against the particular risk involved. In reaching this decision we are impressed by the fact that a reasonable person would not have anticipated that Green, acting as a flagman, was ineptly, almost casually, attempting to warn him of a hidden but extremely grave danger located in an unlikely position in relation to the flagman.
[21] For the foregoing reasons, we conclude that Green failed to carry the burden of proving Page guilty of contributory negligence and that Page is entitled to recover damages.
[22] Page was forty-nine (49) years old at the time of the accident. On January 3, the day of the accident, he was examined by Dr. Merlin L. Reddix, a general practitioner. His condition was diagnosed as osteoarthritis in the back lumbar region and whiplash injury of the neck. The overall impression of Dr. Reddix was that Page's pre-existing arthritic condition had been aggravated somewhat by the trauma. No involuntary muscle spasm was present at the time nor upon any subsequent examination. The initial treatment consisted of muscle relaxants, analgesics, anti-spasmodics, a sedative and a corticord parenal injection.
[23] On January 11 Page was referred to Dr. Carson R. Reed, Jr., an orthopedic surgeon. His examination revealed some limitation of motion of the lumbar spine and tenderness over the posterior aspect of the neck. His diagnosis was osteoarthritis and possible sprain of the lumbo-sacral region and cervical spine. He gave Page a prescription for Butazolidin Alka capsules and advised him to remain under the care of Dr. Reddix.
[24] Between January 16 and February 27 Page visited Dr. Reddix's office six times, receiving a shot of Cortisone on each visit. Dr. Reddix found that Page improved under this treatment and discharged him as clinically cured on February 27, 1974, with no residual damage.
[25] Upon examination of the record we conclude that plaintiff's pre-existing arthritic condition was aggravated to some extent for a period of less than two months by the accident and that the amount of $750 will adequately compensate him for this injury.
[26] In his petition, plaintiff alleged special damages in the amount of $381.66, including $144.66 property damage to his truck and $237 accrued medical expenses. At the trial of the matter, there was certain testimony to indicate medical expenses of $355. However, since this testimony was met by timely objection of defense counsel, and there was no request to amend, the pleadings cannot be considered as enlarged to encompass the additional $118. LSA-C.C.P. Art. 1154.
[27] In light of the foregoing, we find plaintiff is entitled to an award of $381.66 special damages and $750 general damages for his pain and suffering. *West Page 853 
[28] It is therefore ordered that the judgment appealed from be reversed and that there be judgment in favor of plaintiff, Evan Page, against defendant, James R. Green, Jr., in the sum of $1,131.66, together with legal interest and all costs, including costs of this appeal.
[29] Reversed and rendered.