409 So.2d 298 (1981)
Gustave KAPLAN, Individually and for the Estate of the Minor, Linda Kaplan, Plaintiffs-Appellants,
v.
MISSOURI-PACIFIC RAILROAD COMPANY, et al., Defendants-Appellees.
No. 8392.
Court of Appeal of Louisiana, Third Circuit.
December 1, 1981.
*301 Gravel, Robertson & Brady, David W. Robertson and Chris J. Roy, Alexandria, for plaintiffs-appellants.
Provosty, Sadler & deLaunay, LeDoux R. Provosty, Jr. and F. Rae Swent, Alexandria, for defendants-appellees.
Before GUIDRY, FORET and DOUCET, JJ.
FORET, Judge.
Gustave Kaplan brought this tort action, individually, and as administrator for the estate of his minor daughter, Linda Kaplan (Linda). Linda attained the age of 18 years before trial of this action and Sidney Kaplan (Linda's brother) was substituted as a plaintiff, as curator for the interdict, Linda Kaplan. Plaintiffs seek (1) to recover damages for personal injuries suffered by Linda when she was struck and knocked off a railroad bridge by a train and (2) to recover damages for the medical expenses incurred by Gustave Kaplan in providing treatment for Linda's injuries.
Named as defendants are the Missouri-Pacific Railroad Company (MoPac), the owner of the bridge and train, and its employees who were operating the train. These employees are R. B. Walker, L. A. Cole, Herman Harris, Gordon Lovell, and L. B. Crain.
Plaintiffs' action was tried before a jury which returned a verdict in favor of defendants. The trial court, pursuant to that verdict, rendered judgment in favor of defendants and against plaintiffs dismissing plaintiffs' suit with prejudice. Plaintiffs appeal from that judgment and present the following issues:
(1) Whether the trial court properly denied plaintiffs' motion for a new trial after finding the jury's verdict contrary to the law and evidence;[1] *302 (2) Whether the instructions given the jury by the trial court properly reflect the law applicable in light of the pleadings and facts in this case;
(3) Whether the jury correctly found defendants, L. B. Crain and MoPac, not liable to plaintiffs;
(4) Did defendants make an improper appeal to the jury's bias, passion or prejudice?

FACTS
This action arises out of a tragic accident which occurred on April 15,1972 at approximately 2:30 P.M. in Rapides Parish. Linda and three of her friends, Sarah Fuhrer (Sarah), Annie McBride (Annie), and Mary Aertker (Mary) had made plans during the week preceding the accident to go to a place on the Red River between Alexandria and Pineville known as "Sandy Beach". The girls were between 15 and 16 years of age and planned to sunbathe and play on the banks of the river.
On the day of the accident, Linda borrowed an automobile belonging to her brother, Sidney Kaplan, and she and Annie, who had spent Friday night at Linda's house, went to pick up the other two girls. The girls then drove north from Alexandria on U.S. Highway 165 and crossed the Red River on the O.K.Allen Bridge. They proceeded to the Fort Buhlow Recreation Park, which is located on the left side of U.S. Highway 165 as one comes off the O.K.Allen Bridge heading north. The girls turned into the recreation area, passed through a gate, and got on top of the levee paralleling the river. There is a small road on top of the levee, and they headed west down that road for approximately one-half of a mile until they came to the MoPac's track leading to its bridge across the river.
The MoPac bridge is 1060 feet long and there is a curve in the track as it approaches the bridge from the north. Sandy Beach is located near the south end of the bridge or Alexandria side of the Red River. The girls got out of the automobile and began walking down the railroad track toward the bridge. They crossed the bridge and walked down the south bank of the river to Sandy Beach where they remained for about a half-hour. They then decided to go back across the river to the recreation area and were crossing the bridge in single *303 file with Mary in the lead followed by Sarah, Annie and Linda.
Meanwhile, MoPac Train Number 85 was headed south toward the bridge. The train consisted of 4 diesel locomotives and 113 freight cars and was traveling at 38 miles per hour as it came out of the curve north of the bridge. Mary saw the train at about the same time as the engineer began to blow the horn in his attempt to warn them. She screamed and she and Sarah ran down the trestle toward the train and jumped onto a cement piling. The engineer placed the train in emergency stop, but it continued forward for another 1800 feet. It finally came to a stop with the lead locomotive right at the point where the south approach to the bridge begins. It had traveled across the bridge and in doing so had knocked Annie and Linda off. Annie had fallen a few feet and was not seriously injured. However, Linda had fallen a little over 40 feet to the hard ground below and was knocked unconscious, suffering serious permanent injury.
Plaintiffs instituted this action on March 20, 1973, alleging numerous acts of negligence on the part of MoPac and its employees who were operating the train. Defendants answered, denying any negligence on their part, and pleading the affirmative defenses of contributory negligence and assumption of the risk. Plaintiffs have dismissed, with prejudice, their suit against Walker, Lovell, Cole and Harris. The only defendants now are MoPac and Crain, the engineer operating the train at the time of the accident.
Trial of plaintiffs' action began on September 22, 1980, with the selection of the jury. Pursuant to a motion made in open court by plaintiffs, the trial court rendered judgment of dismissal as of non-suit as to defendant, L. B. Crain. The next day, defendants filed a petition for removal in the United States District Court for the Western District of Louisiana seeking to remove this action to that court. Defendants based jurisdiction in the federal court on diversity of citizenship existing between plaintiffs and the remaining defendant, MoPac. The trial court stayed the proceedings upon being informed of this.
Plaintiffs immediately filed a "Motion to Reinstate as Defendant or, Alternatively, Motion for New Trial" seeking to have L. B. Crain reinstated as a defendant to the action. The trial court granted plaintiffs' motion and denied defendants' motion for an appeal from that judgment. On September 29, 1980, defendants filed, in the trial court, a "Notice of Intention to Apply for A Writ" to this Court. Defendants also filed a "Notice of Intent to Apply for Supervisory Writs" to the Louisiana Supreme Court at that time. That same day, we granted writs and made them peremptory stating:
"WRITS GRANTED AND MADE PEREMPTORY. Trial court's judgment reinstating Mr. Crain as a defendant is invalid. Under the facts of this case, the only means the trial court had to invalidate its judgment of Sept. 23,1980 dismissing Mr. Crain was to follow the procedure as outlined in LSA-C.C.P. Art. 1971, et seq.
It is further ordered that the respondents are hereby granted a stay order of 24 hours in which to apply to the Supreme Court for writs."
The Louisiana Supreme Court, on September 29, 1980, stated that the application for writs was not considered because relators had obtained the relief sought by order of this Court.
Meanwhile, plaintiffs had filed a "Petition for Remand" in the United States District Court, (W.D. Louisiana) on September 23, 1980, which motion was denied by that court on September 25, 1980. On September 26, 1980, acting on plaintiffs' "Application for Mandamus, Prohibition, and Extraordinary Relief", the United States Court of Appeal for the Fifth Circuit reversed the district court and ordered that this case be remanded to the Ninth Judicial District Court for the State of Louisiana.
The trial of plaintiffs' action was resumed that same day and lasted until October 7,1980. The case then went to the jury which returned a unanimous verdict in favor of defendants after deliberating for 30 *304 minutes. Plaintiffs' motion for a new trial was denied by the trial court, which granted them this appeal.

JURY INSTRUCTIONS
Plaintiffs assign as error the trial court's refusal to give certain instructions to the jury, as requested by them, and the trial court's charge to the jury, which they claim contains erroneous instructions. Defendants contend that plaintiffs are precluded from raising any issues concerning the jury instructions as they failed to timely object to them.
The record shows that at the close of the testimony and evidence, the trial court convened a special hearing to allow plaintiffs and defendants time to object to its proposed jury instructions. The parties had previously presented to the trial court their requested special jury instructions and numerous memoranda in connection therewith. At the conclusion of this hearing, the trial court and the parties entered into an agreement regarding the timeliness of objections to the instructions. That agreement reserved to the parties the right to make these objections after the trial court had charged the jury and they had retired to deliberate. The trial court also stated that it would consider the objections made at this special hearing as being reurged automatically at the close of its charge to the jury.
LSA-C.C.P. Article 1793 provides:
"Art. 1793. Instruction to jury; objections
At the close of the evidence or at an earlier time during the trial as the court reasonably directs, a party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.

A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury." (Emphasis ours.)
LSA-C.C.P. Article 1793 provides that an objection to the giving or the failure to give an instruction must be made before the jury retires to consider its verdict. An agreement, similar to the one entered into by the parties, was held to be invalid in Outlaw v. Bituminous Insurance Co., 357 So.2d 1350 (La.App. 4 Cir. 1978), writ denied, 359 So.2d 1293 (La.1978). However, four of the present Justices of the Louisiana Supreme Court concurred in the writ denial stating on 359 So.2d 1294:
"DIXON, CALOGERO, MARCUS and DENNIS, JJ., concur in the denial but note that it was error for the Court of Appeal to refuse to consider defendant's objection to the jury charges, made by agreement after jury had retired. Such agreement does not conflict with CCP 1793. Nevertheless full review by Court of Appeal makes the error harmless."
We will give effect to the parties' agreement in the present action.
In a jury trial, the judge is not required to give the precise instructions submitted by either party, but he must give instructions which properly reflect the law applicable in light of the pleadings and facts in each particular case. If instructions concerning negligence and liability are confusing or misleading, or omit an applicable essential legal principle, such instructions constitute reversible error. Miller v. Fogleman Truck Lines, Inc., 398 So.2d 634 (La.App. 3 Cir. 1981), writ denied, 401 So.2d 358 (La.1981); Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975); Beck v. Lovell, 361 So.2d 245 (La.App. 1 Cir. 1978), writ denied, 362 So.2d 802 (La.1978).

A.
Plaintiffs contend that the trial court erred in refusing to instruct the jury that a violation of MoPac's own safety rules is evidence of negligence. The trial court refused to give this instruction believing that it might convey to the jury the impression *305 that such a violation constitutes negligence per se. We have reviewed plaintiffs' proposed special jury instruction and agree that it may have misled the jury, if given. We further find that the essence of this instruction was included in the trial court's general charge that, "... the evidence in the case always consists of the sworn testimony of the witnesses, and all exhibits received in evidence". Plaintiffs introduced in evidence MoPac's "Uniform Code of Operating Rules" and the railroad employees were extensively questioned as to whether any of those rules had been violated.

B.
Plaintiffs contend that the trial court erred in refusing to instruct the jury that negligence is determined by weighing the likelihood of harm and the gravity of harm threatened against the burden of taking the requisite precautions. The trial court apparently felt that such an instruction might be construed by the jury improperly as a comment on the facts. We have reviewed the trial court's charge to the jury with respect to the issue of negligence and find it to be adequate.
Adequate instructions are those instructions which fairly and reasonably point up the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application thereto. Miller v. Fogleman Truck Lines, Inc., supra; Bienvenu v. Angelle, 254 La. 182, 223 So.2d 140 (1969); Hanks v. Drs. Ranson, Swan and Burch, Ltd., 359 So.2d 1089 (La. App. 3 Cir. 1978), writ denied, 360 So.2d 1178 (La.1978). The record shows that the trial court included La.Civil Code Article 2315 in his charge to the jury. He then correctly explained to the jury that a breach or disregard of a legal duty constitutes fault and, further, that a defendant's fault must be causally related to the injury suffered by plaintiff for the defendant to be held liable.

C.
Plaintiffs contend that the trial court erred in refusing to instruct the jury that LSA-C.C. Article 2322 afforded an alternative basis for strict liability under the pleadings and facts of this case. The trial judge refused to give this instruction because he felt it would be too confusing to explain to the jury how a railroad bridge could be considered a "building" for purposes of LSA-C.C. Article 2322. The record shows that the trial court did charge the jury as to the provisions of LSA-C.C. Article 2317. The trial court also took great care in explaining to the jury the law respecting that portion of LSA-C.C. Article 2317 relating to things in the custody of a defendant, which create an unreasonable risk of harm to others. The trial court also explained the causal relationship which must exist between the defect in the thing that presents an unreasonable risk of harm to others and the injuries suffered by a plaintiff, in order for defendant to be held liable. We find that the trial court adequately explained the law surrounding the issue of strict liability.

D.
Plaintiffs contend that the trial court erred by instructing the jury on the doctrine of contributory negligence as, under the facts shown at trial, no charge should have been given on the doctrine. We find that plaintiffs made no objection to the trial court's giving of this charge either at the special hearing it conducted on its proposed jury instructions or after the jury had retired to deliberate. Thus, we conclude that plaintiffs waived this objection.

E.
Plaintiffs contend that the trial court erred in refusing to instruct the jury that when defendant's negligence is aggravated, ordinary contributory negligence of the victim is no defense. Again, we find that plaintiffs have waived this objection by failing to make it at the times specified in the parties' agreement.

F.
Plaintiffs contend that the trial court erred in refusing to instruct the jury on the *306 applicability of the "Baumgartner" doctrine under the facts of this case. See Baumgartner v. State Farm Mutual Automobile Insurance Company, 356 So.2d 400 (La. 1978). Baumgartner arose out of an accident involving an automobile which struck a person crossing Canal Boulevard in New Orleans in a pedestrian crosswalk. Baumgartner held, on page 406:
"Accordingly, we hold that the doctrine of `last clear chance' has no application in absolving a motorist from liability when he negligently strikes a pedestrian. In the city a motorist is obligated to maintain a lookout for pedestrians at crosswalks at all times. If he fails to see a pedestrian in a position of peril when he should have, the motorist is at fault and is responsible. A motorist who could have avoided injury to a pedestrian by the exercise of care which is reasonable under the circumstances is at fault, and is responsible. The motorist cannot escape liability by proving that the pedestrian, admittedly in peril because of his own negligence, could have avoided injury more quickly than the motorist. The operator of a motor vehicle, a dangerous instrumentality, has the constant duty to watch out for the possible negligent acts of pedestrians and avoid injuring them. A higher standard of care than that required of pedestrians is imposed upon the motorist commensurate with the hazards his conduct inflicts upon the public safety. Therefore, he should not be able to escape responsibility for injury to the pedestrian by pleading the latter's negligence. And since, in such case, a plaintiff's contributory negligence will not bar his recovery, the last clear chance doctrine, used to avoid the harsh effects of the contributory negligence defense, is not at issue.8
It must be noted, however, that a motorist who exercises all reasonable care to protect a pedestrian, who nonetheless suffers injury, is not at fault." (Emphasis ours.)
This Court, in Widcamp v. State Farm Mutual Automobile Insurance Company, 381 So.2d 937 (La.App. 3 Cir. 1980), expanded Baumgartner's holding to cases where the pedestrian is struck in some other area besides the crosswalk[2]. Plaintiffs would have us further expand the Baumgartner doctrine to include accidents between railroad trains and pedestrians. We decline to do so on the facts of this case.
There is a great difference between a motorist operating his vehicle on the public streets and highways, and a railroad operating its trains on its own right-of-way. Except for those areas designated for the public to cross the railway, a pedestrian has no right to be on the right-of-way, which is essentially private property. Equally obvious is the fact that an automobile is much easier to control than a train and the driver of an automobile has a much better chance to avoid injuring a pedestrian than does a locomotive engineer. There is a long line of jurisprudence in this State to the effect that an engineer, when sighting a person or a vehicle on the track, can presume that he or it will move from the position of danger upon the sounding of the train's bell or the blowing of its whistle or horn; and, that it is only when the engineer realizes that the warnings are not going to be heeded that he should make an effort to stop the train. See Wheat v. New Orleans and Northeastern Railroad Company, 245 La. 1099, 163 So.2d 65 (1964); Breaux v. Texas and Pacific Railway Company, 176 So.2d 640 (La.App. 1 Cir. 1965), writ denied, 248 La. 375, 178 So.2d 660 (1965); Hymel v. Texas & New Orleans Railroad Company, 145 So.2d 138 (La.App. 4 Cir. 1962), writ denied, So.2d (La.1962); Fradella v. Texas *307 & New Orleans Railroad Company, 86 So.2d 414 (La.App. Orl. Cir. 1956); Cooper v. Employers Commercial Union Insurance Company, 325 So.2d 383 (La.App. 4 Cir. 1976).
We find that the trial court correctly refused to instruct the jury on the "Baumgartner" doctrine.

G.
Plaintiffs contend that the trial court erred in refusing to instruct the jury that Linda's negligence, if any, would not be a defense if either the injuries fell outside the scope of her duty or were within the scope of defendants' duty. We find that plaintiffs failed to object to the trial court's refusal to give this instruction at the times agreed upon by the parties. Thus, the objection is waived.

H.
Plaintiffs contend that the trial court erred in refusing to charge the jury on the "sudden emergency" doctrine. We agree with plaintiffs that the sudden emergency doctrine provides a defense or exception to both primary negligence and contributory negligence. See Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (1972). However, the doctrine requires that the emergency, in which the party claiming the benefit of the doctrine finds himself, and which requires him to act, did not come about as a result of his own negligence. There was no evidence adduced by plaintiffs which would support a finding that the emergency, in which Linda found herself, did not come about as a result of her own actions. Thus, the trial court properly refused to give an instruction to the jury on the doctrine of sudden emergency.

I.
Finally, plaintiffs contend that the trial court erred in instructing the jury on the affirmative defense of "assumption of the risk". Essentially, plaintiffs argue that defendants failed to adduce any evidence tending to show the existence of such a defense. Plaintiffs rely on Gasquet v. Commercial Union Insurance Company, 391 So.2d 466 (La.App. 4 Cir. 1980), which contained the following quote from an earlier decision by that court in Jackson v. West Jefferson General Hospital, 245 So.2d 724 (La.App. 4 Cir. 1971):
"A charge, even if it is a correct statement of law, must be based on evidence adduced in the case in order for the jury to make the conclusion permitted in the charge. Guerra v. W. J. Young Construction Co., Inc., 165 So.2d 882 (La.App. 4th Cir. 1964)."
We are unable to say whether the jury based its verdict on a finding that defendants were not negligent, or that Linda had assumed the risk that led to her injuries, because of the general verdict form used. However, for the following reasons, we conclude that the jury could have correctly made a finding of no liability on either basis.
Plaintiffs rely on the decision in Dorry v. Lafleur, 399 So.2d 559 (La.1981) and Dofflemyer v. Gilley, 384 So.2d 435 (La.1980). Dofflemyer stated, on page 438, that:
"It is fundamental that, in order to assume a risk, one must knowingly and voluntarily encounter a risk which caused him harm. Plaintiff must understand and appreciate the risk involved and must accept the risk as well as the inherent possibility of danger because of the risk. Prestenbach v. Sentry Insurance Co., 340 So.2d 1331 (La.1976); McInnis v. Fireman's Fund Insurance Co., 322 So.2d 155 (La.1975); Brantley v. Brown, 277 So.2d 141 (La.1973); Langlois [v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971)], supra."
It is clear that a determination of whether a plaintiff assumed the risks that resulted in his injury is based upon a subjective inquiry into plaintiff's appreciation of those risks. Annie testified that all four girls discussed the fact that they would cross the bridge to get to Sandy Beach, and of being frightened because a train might come while they were on it. They discussed the options they would have in case that *308 happened, and decided that they would climb onto the superstructure to avoid being hit. They discussed the fact that the block signal[3] past the south end of the bridge was green and whether this meant it was safe to cross. Annie testified that, when she and Linda first realized that the train was bearing down on them, they turned and ran toward the superstructure pursuant to their plan. However, because they believed that they would not make it, they again turned and ran toward the train. We note that in a statement which she had given shortly after the accident, Annie did not mention the fact that she and Linda had at first turned and ran toward the superstructure upon seeing the train.
Mary also testified that the girls discussed the fact of the block signal being green and what this meant. They discussed the fact that trains did use the bridge and that she had seen them in the past. However, she stated that she did not believe that they had discussed what evasive actions to take if a train came that day. She did feel that Linda and Annie had hesitated when they realized that the train was coming. Sarah could not recall whether any discussion of these matters had taken place.
We find that there was evidence adduced upon which the jury could have correctly concluded that Linda had assumed the risk of being injured on the bridge by a passing train. There is no merit to any of plaintiffs' contentions regarding the instructions given the jury by the trial court.

DEFENDANTS' ALLEGED NEGLIGENCE
Plaintiffs contend that L. B. Crain's conduct in operating the train as he did constitutes actionable negligence. Plaintiffs further contend that the personal injuries suffered by Linda resulted from this negligent conduct as did the medical expenses which were incurred in providing treatment for her injuries. Thus, plaintiffs argue that Crain is liable to them in damages for these items.
Crain is alleged to have committed the following acts of negligence: failing to see what he should have seen; failing to keep a proper lookout; failing to timely blow the horn in advance of actually seeing the bridge; failing to keep the locomotives properly sanded and the brake drums aired so as to stop the train timely; failing to keep a proper lookout and to apply the brakes sooner; approaching a known dangerous area at an excessive rate of speed; and, failing to avail himself of the last clear chance to avoid the accident by simply blowing the train's horn sooner and/or applying the brakes sooner, and/or stopping the train.
Plaintiffs also contend that MoPac was negligent and that this negligence, either independently of or in combination with Crain's alleged negligent conduct, resulted in the accident. MoPac is alleged to have been negligent in the following instances: failing to maintain the right-of-way so as to permit visual inspection of the bridge at a greater distance than 1000 feet; failing to post warning signs prohibiting the use of the bridge by pedestrians and the general public; failing to warn of the potential danger in using the bridge; failing to erect barricades and/or other impediments prohibiting people from using the bridge; knowing that people were using the bridge, failing to make provisions for exiting the same should a train arrive; failing to post a whistle board and/or other warning devices a sufficient distance from the approach to the bridge so as to instruct the engineer to blow the whistle which would have warned petitioner's daughter and others who may have been on the bridge of the impending approach of the train, thereby averting the accident; and, maintaining a wooden walkway along the length of the bridge as a footpath across the river and facilitating the presence of persons on the bridge.
The first inquiry in making a determination of liability in this case is whether any causal relationship exists between the harm suffered by Linda and defendants' *309 alleged negligent conduct. Thus, if plaintiffs can show that Linda probably would not have suffered the injuries complained of but for defendants' conduct, plaintiffs have carried their burden of proof relative to cause-in-fact. Shelton v. Aetna Casualty & Surety Company, 334 So.2d 406 (La.1976); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Vidrine v. Missouri Farm Association, 339 So.2d 877 (La. App. 3 Cir. 1976), writ denied, 342 So.2d 216 (La.1977); Steward v. Gibson Products Co. of Natchitoches Parish Louisiana, Inc., 300 So.2d 870 (La.App. 3 Cir. 1974).
Photographs introduced by the parties, as well as testimony, clearly show that the railroad track curves as it approaches the north end of the MoPac bridge, which is the direction from which the train that struck Linda came. The curve ends approximately 400 feet from the trestle leading to the bridge itself. However, because the curve is a gradual one, it is possible to see the bridge and its north approach from a greater distance than that. Further, the employees operating a train are some 15 feet above ground level and this also increases the distance from which the bridge may be seen. The speed limit on this particular stretch of track was set by MoPac at 50 miles per hour.
Crain testified that the train was traveling between 40 and 45 miles per hour when he began to apply the brakes north of a point where the tracks of the Louisiana and Arkansas Railway cross MoPac's. This crossing is located approximately 1¼ miles north of the bridge. He stated that there were two reasons for doing this. First, there is a turn-out[4] located some 400 feet south of the bridge, which had a speed limit of 35 miles per hour. Also, there is a block signal[5] near the turn-out, and the signal being displayed must be obeyed. At a point approximately 1 mile south of the bridge, the MoPac tracks are intersected by the main tracks of the Texas and Pacific Railway. This intersection is protected by another block signal. If this signal is green (indicating all clear), then the signal at the turn-out will display green. However, if the signal protecting the intersection is red, then the signal near the turn-out will display yellow, indicating that the train may approach the intersection, but must be prepared to stop at the next signal.
Crain testified that as he was coming around the curve north of the bridge, he was looking for the block signal near the turn-out. He had his left hand on the brake valve handle and was either going to release the brakes if the signal was green or apply them for a while longer if it was yellow. He stated that he never saw the signal because as the north approach to the bridge came into view, he saw the girls on it. Crain testified that the train was traveling at 38 miles per hour and was 800 feet from where the girls were on the bridge when he saw them. He immediately put the train in emergency stop[6] and began blowing the horn and ringing the bell. The effect of this was that all four locomotives immediately shut down and the brakes on the train were applied at maximum. Unfortunately, the train could not stop in time and knocked Annie and Linda off the bridge.
*310 Gordon Lovell, the head brakeman on the train, was the only other railroad employee who was an eyewitness to the accident. He essentially gave the same testimony as Crain regarding the occurrence of the accident. Sarah and Mary testified that the train was almost out of the curve when they looked up and saw it coming. They testified that the engineer began blowing the horn at about the same time as they saw the train. Thus, the girls testified that the train was around 500 feet away when they saw it, while the railroad employees testified that the train was around 800 feet away from the girls when they first saw them. This discrepancy can be explained by the following factors. First, the girls were looking down rather than straight ahead when the train rounded the curve. Second, the distances testified to are no more than approximations by the witnesses. Finally, Crain testified that he placed the train in emergency stop when he saw the girls and then began blowing the horn and ringing the bell.
We find that Crain was keeping a proper lookout and did see what he should have seen at the time that the accident occurred. There was testimony from all of the crewmen that the train had been fully inspected in Monroe, its point of origin. Also, that it had been fully inspected twice, once at Grayson, and once at Georgetown, in route to Alexandria. In addition, a locomotive and freight cars added to the train at Tioga were inspected at that time. We find that the locomotives had been sanded and that the brakes on the train were working properly when the accident occurred.
Plaintiffs strenuously argued that MoPac had violated one of its own rules by either removing a whistle post[7] from the curve or failing to erect one there. The placement of a whistle post there would have caused an engineer to begin sounding the train's horn while still in the curve. The rule allegedly violated by defendants is rule # 14 of the "Uniform Code of Operating Rules" adopted by MoPac on June 2, 1968, and effective at the time of the accident. This rule provides, in pertinent part:
"14. Engine Horn or Whistle Signals.
-The horn or whistle must be sounded as prescribed by rule or law. Horn or whistle must not be used unnecessarily.

In case of horn or whistle failure, speed must be reduced and bell rung continuously when approaching and passing through stations, yards, over public crossings at grade and around curves." (Emphasis ours)
As can be seen, this rule does not require an engineer to sound the train's horn around curves[8]. It only requires that the bell be rung continuously when going around a curve, if the horn or whistle has failed.
Plaintiffs also argue that defendants violated rule 14(1) which provides:
*311
"(l) __ __ o _____ Approaching public
 crossings at grade. Signal
 must begin at least 20
 seconds before reaching
 crossing. To be prolonged
 or repeated until crossing
 occupied. When whistle
 sign is displayed, signal
 must begin before reaching
 sign.
 This signal must also be
 frequently sounded to
 warn trackmen and other
 employes when view is
 restricted by weather, obscure
 curves, or other unusual
 conditions, and when
 approaching tunnels."
 (Emphasis ours.)
(The lines mean a long blast of the horn, the o's mean a short blast.)
As can be seen, this rule requires that the horn be sounded when going around obscure curves to warn trackmen and other employees. Defendants presented evidence indicating that the presence of trackmen or other employees on a certain section of track would be known of in advance by the train crew because this information would be given to them in the train orders which they receive while operating the train. Further, this section of track, including the curve, is protected by block signals.
Finally, plaintiffs argue that defendants violated rule 14(m) which provides:
"(m) _____ Approaching stations, junctions,
____________________ railroad crossings at
 grade, drawbridges and
 mail cranes between stations,
 as may be required."
 (Emphasis ours.)
As can be seen, this rule only requires the engineer to sound the horn when approaching drawbridges, as may be required[9]. The system timetable issued by MoPac, and in effect at the time of the accident, designates only one bridge between Monroe and Alexandria as a drawbridge. This is Mo-Pac's bridge over the Ouachita River near Columbia. The evidence shows that MoPac's bridge over the Red River is rarely opened. At the time of the accident, the procedure to open the bridge required that the Coast Guard give MoPac 24 hours advance notice that the bridge would have to be opened. MoPac would then assemble a crew of 16 men, who would have to work approximately 3½ hours to open the bridge. Notice that the bridge was to be opened would be given in the train orders issued to crews on the trains affected. Further, the bridge is protected by block signals.
We find that defendants did not violate any of their own safety rules. We observe that a violation of these rules would not necessarily be a breach of any duty owed to Linda, though, it could be a breach of a duty owed to MoPac's employees. We find no merit in plaintiffs' contention.
Assuming arguendo that plaintiffs' remaining allegations of negligent conduct on the part of the defendants did occur and were a cause-in-fact of Linda's injuries, we find no actionable negligence on the part of defendants.
The Louisiana Supreme Court, in Shelton v. Aetna Casualty & Surety Co., supra, citing earlier decisions, set forth the following analysis in making a determination of liability in tort actions based on negligence.[10]Shelton stated, on pages 409 and 410, that:
"A finding that defendant's conduct was the cause in fact of plaintiff's injury, however, does not establish liability. In addition, we are required to ascertain whether the landowner breached a legal duty imposed to protect against the particular risk involved. Smolinski v. Taulli, 276 So.2d 286 (La.1973); Hill v. Lundin & *312 Associates, Inc., supra; Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1971); Page v. Green, 306 So.2d 847 (La. App.2d Cir. 1975). In making this determination, the following inquiries must be made: (1) What, if any, duty was owed by the landowner to the plaintiff? (2) Was there a breach of this duty? (3) Was the risk, and harm caused, within the scope of protection afforded by the duty breached? Jones v. Robbins, [289 So.2d 104 (La.1973)] supra.; Hill v. Lundin & Associates, Inc., supra; Thomas v. Hanover Insurance Co., 321 So.2d 30 (La.App. 3rd Cir. 1975)."
In the context of the present action, we believe that the crucial issue is whether defendants had notice that the bridge was being used by pedestrians to cross the river. A determination of this issue will show the duty, if any, owed by defendants to Linda.
Plaintiffs contend that the bridge is located next to a heavily used recreation area and that defendants knew that large numbers of people were in the area surrounding the north approach to the bridge and were using the bridge to cross the river. The railroad track leading to the north approach passes on the side of Lake Buhlow, which is a popular recreation area. However, the picnic grounds, etc. comprising the Fort Buhlow Recreation Park are located approximately ½ of a mile from the north approach. There are only two ways to get to the north approach other than by water. One is to pass through a gate, which existed at the time of the accident, and to travel on a small gravel road on top of the levee.
William H. Taber was the superintendent of the Red River-Atchafalaya Levee District, Bayou Boeuf District, at the time of the accident. He testified that the Levee Board had full control over the levee located between Buhlow Lake and the Red River. Prior to 1972, he had been ordered to erect a fence and gate between the levee and the Fort Buhlow Recreation Park to keep people off the levee. He stated that in 1972 the gate was kept locked but that people would simply tear the fence down and go on the levee. This was done in spite of the fact that posted signs were placed on both sides of the gate. Clearly, the levee and the north approach to MoPac's bridge are not part of any recreation area. The only other way to get to the north approach was to go around the lake and drive back down along the tracks on a road that was impassable at times and was impassable on the day of the accident.
Crain testified that he had operated hundreds of trains across the bridge and had never seen anyone on it. R. B. Walker, a senior locomotive engineer with MoPac, was riding in the cab of the rear locomotive of Train # 85 on the day of the accident. He testified that he had seen people on the trestles approaching the bridge, but never on the bridge itself. He had also seen people and cars in the area where the access road on top of the levee meets the railroad track. Herman Harris, the conductor on Train # 85, testified that he had worked with MoPac for 38 years prior to retiring and that he had never seen anyone on the bridge. Gordon Lovell testified that he had occasionally seen people on the bridge in the past.
Plaintiffs introduced the testimony of several witnesses in their attempt to show that the bridge was frequently being used by people to cross the river. Everitt Porter testified that he and some friends rode motorcycles across the bridge once but were not seen by any railroad employees. William Ratcliff stated that when he was 15 years old, he and his friends would play on the bridge. He further stated that he and a friend were on the bridge one night when a train headed north stopped about 200 yards south of the bridge. He and his friend then walked by the crewmen and said, "Hey" to them. He was also caught on the bridge one time and had to hang onto the superstructure to avoid being hit. Twice he had to jump from the trestles onto the ground below. He admitted under cross-examination that on the night that the train stopped, he and his friend weren't on the bridge but on the track leading to the bridge. Doug Gremillion, one of Ratcliff's friends, testified that he too had been on *313 the bridge when the train came and had to climb on the superstructure to avoid being hit.
Robert Beck testified that he crossed the bridge one time with a friend and that a train came while they were crossing, but that they were near the end and simply walked off the bridge. Joseph N. Coco, III testified that he and three friends made a movie on the bridge, which took about four or five hours. They had been on the bridge several times before. He testified under cross-examination that they had never seen anyone else on the bridge. He also admitted stating to another person that a reason for going on the bridge was that it was thrilling and challenging. Sarah testified that she had gone on the bridge twice before and had seen kids playing on it, but had never seen a train on it. Mary testified that she too had been on the bridge in the past but that she had never been on it when a train had passed. She stated that she and a friend were playing on the ground near the south approach one day when they noticed a train stopped further to the south. They walked up to the train and were warned by one of the crewmen to stay off the bridge because it was dangerous. However, as soon as the train left, they walked across the bridge in spite of the warning given them.
The evidence shows that this bridge presented an obvious danger to anyone attempting to walk across the river on it and that it was used infrequently in this manner. Some of plaintiffs' own witnesses testified that they had only been on the bridge once or that no railroad employees had seen them while they were on it. We find that railroad employees had rarely seen people on the bridge in the past and had no notice that it was being used by pedestrians to cross the river. Under these facts and circumstances, Crain's only duty toward Linda, and others similarly situated, was to be alert and to attempt to avoid injuring them once their being in a position of peril became known to him or should have become known to him.[11] We find no breach of this duty by Crain with respect to Linda.
As for MoPac, we find that it had no notice that pedestrians were using its bridge to cross the river. Indeed, the evidence shows that few people used it in that manner. Linda and her companions had no valid reason for being on the bridge. There was a road on the south levee of the Red River which passed right by Sandy Beach and which provided a much safer method of reaching it. However, we recognize that Linda's status at the time (invitee-licensee-trespasser) is of little help in applying LSA-C.C. Article 2315. See Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La. 1976).
In determining an owner's liability under LSA-C.C. Articles 2315 and 2316, the test has been stated to be whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others. Walker v. Union Oil Mill, Inc., 369 So.2d 1043 (La.1979); Shelton v. Aetna Casualty & Surety Co., supra.
The court, in Walker, stated the following on page 1047 with respect to the duty owed by the owner and operator of a facility (there a soybean/grain elevator) to others:
"The owner and operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. In determining a particular defendant's duty consideration should be given to the nature of the facility and the dangers presented by it. In considering a defendant's duty to a particular person, consideration *314 should be given to the person's age, maturity, experience, familiarity with the premises and its dangers, and other such factors which might increase or decrease the risk of harm to that person. The duty would be greater to a person of young age and immature judgment. It would be lesser to a person with experience, knowledge and familiarity with the premises."
The facility in the present action is the bridge, together with its approaches. It was designed and built as a bridge to carry trains across the Red River and nothing else. The curve in the track as it approaches the bridge from the north is completely visible to anyone contemplating crossing the bridge in either direction. So is the fact that there are very few places on the bridge where one may seek safety if caught by a train while crossing it.
Linda was 15 years old when the accident occurred and had never been on the bridge before. However, before going on the bridge, she and her companions discussed the fact that a train might come while they were on it. They even went as far as discussing what evasive actions they might take if that happened. One of the options they had discussed was hanging on to the superstructure if a train came. Because the dangers were obvious and were appreciated by Linda and the others, we find no breach by MoPac of its duty of not exposing persons, such as them, to unreasonable risks of injury or harm.[12]
Having concluded that there was no breach of duty on the part of either defendant, there is no need to inquire whether the risk and harm caused were within the scope of the protection afforded by either defendant's duty. We find no actionable negligence based on the conduct of either defendant.

STRICT LIABILITY
Plaintiffs sought to hold MoPac and Crain liable to them on the basis of strict liability as provided for in LSA-C.C. Articles 2317 and 2322. They contend that the track, right-of-way, and bridge were defective, and that Linda was injured because of these defects. They allege the following defects:
(1) the right-of-way, obscured by vegetation so as to shorten the distance from which trainmen could see persons on the bridge or persons on the bridge could see oncoming trains;
(2) the right-of-way, lacking a sign instructing the engineer to sound a whistle or horn a suitable distance from the bridge so as to warn persons who might be on the bridge;
(3) the bridge, equipped with an inviting walkway along its entire length, which facilitated and encouraged its use as a means of crossing the river on foot;
(4) the bridge, lacking "no trespassing" signs or other warning devices and of lacking any means whereby persons trapped on the bridge by an oncoming train could step off to safety;
(5) the bridge itself with no places of escape or safety save on the superstructure.
LSA-C.C. Article 2317 provides:
"Art. 2317. Acts of others and of things in custody *315 Art. 2317. We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
For recovery under LSA-C.C. Article 2317, a plaintiff must show: (1) that the thing which caused the injury was in the care and custody of the defendant-owner; (2) that a vice or defect existed in the thing; (3) that the vice or defect caused the injury. A vice or defect is defined as the creation of an unreasonable risk of injury to another. Reinhard v. City of New Orleans, 371 So.2d 286 (La.App. 4 Cir. 1979), writ denied, 374 So.2d 656 (La.1979); Loescher v. Parr, 324 So.2d 441 (La.1975).
It is obvious that the bridge, track, and right-of-way were not owned by, or in the care and custody of defendant, L. B. Crain. Thus, he is not strictly liable to plaintiffs for any injuries which may have been caused by defects in those things.
It is also obvious that MoPac does have the care or custody of those things. Thus, if plaintiffs proved the existence of a defect or vice in the thing, and that this defect or vice caused the injuries complained of, then MoPac may be held liable to them.
The evidence indicates that the track, bridge, and right-of-way were in the condition alleged by plaintiffs at the time of the accident. The issue is whether this condition created an unreasonable risk of injury to others. For the following reasons, we conclude that it did not.
We agree with plaintiffs' contention that the bridge presented a danger to anyone crossing it on foot. However, those dangers are clearly visible to anyone contemplating using it in such a manner. They are clearly visible to us from a perusal of the photographs entered in evidence.[13] It is apparent to the dullest that the bridge was not designed for pedestrian crossing. We again note the testimony of Annie and Mary that all four girls discussed the dangers of going on the bridge. Arch Pearson was a claims agent with MoPac from 1949 to 1973. He stated that his job was to investigate all accidents involving railroad personnel or equipment and that his territory included MoPac's bridge over the Red River. He testified that he knew of no other accidents occurring on that bridge besides the one giving rise to this action.
We find that plaintiffs have failed to prove that the bridge, tracks, and right-of-way presented an unreasonable risk of injury to others. Thus, MoPac is not liable to them under the provisions of LSA-C.C. Article 2317. Plaintiffs have made no argument concerning the applicability of LSA-C.C. Article 2322. Having made the above findings on the issues of negligence and strict liability, we conclude that the jury correctly found no liability on the part of MoPac or Crain for the injuries suffered by Linda.

APPEALS TO JURY BIAS, PASSION AND PREJUDICE
We note that plaintiffs failed to object to any of the questions or arguments of defense counsel, which they alleged were improper appeals to the jury's bias, passion or prejudice. However, our review of the record discloses no evidence whatsoever that this occurred.
For the above and foregoing reasons, the judgment rendered by the trial court pursuant to the jury's verdict is affirmed.
All costs of this appeal are assessed against plaintiffs-appellants.
AFFIRMED.
NOTES
[1] At a hearing on plaintiffs' motion for a new trial, the trial judge rendered a nine-page opinion stating why he felt that the jury verdict was contrary to the law and the evidence, but yet he refused to grant a new trial, concluding that "justice will be best served by allowing the Third Circuit to review the law and the record in light of my conclusions and act appropriately".

We know of no statutory or jurisprudential authority allowing a trial judge to deny a motion for a new trial, while in the same breath stating for the record that the jury verdict is contrary to the law and evidence. On the contrary, C.C.P. Article 1972 mandates that a new trial shall be granted "where the judgment appears clearly contrary to the law and the evidence". The "conclusions" of the trial judge in this case might have some validity if he had acted according to law and granted a new trial. In our view, since he failed to follow through on his own conclusions, we, on appeal, attach no significance to these conclusions and will review the case from the viewpoint of the manifest error rule as applied to the jury verdict.
We are aware of the fact that in Riddle v. Menard, 355 So.2d 1350 (La.App. 3 Cir. 1978), writ denied, 359 So.2d 627 (La.1978), we went ahead and considered the case on appeal even though the trial court judge had expressed strong feelings that the judgment was contrary to the law and the evidence, but yet did not grant a new trial.
As in Riddle, the record in this case is complete. However, in considering the appeal rather than reversing the trial court's denial of the motion for a new trial and remanding the case for a new trial, we do not wish to establish a precedent of allowing trial courts under such circumstances to "transfer" a case to this Court of Appeal in the interest of judicial economy, or under some other notion. Article 1972 of the Code of Civil Procedure is mandatory and should be followed by the various trial courts. However, in this particular case, which has been pending since 1972 (for no good reason apparent from the record), which required three weeks to try, and because of the large number of witnesses, expert and lay, involved herein, some of which may now be missing or dead, we will, in the interest of justice, consider the case on the merits. We emphasize, however, that the notion of "in the interest of judicial economy" is not to be equated with the concept of "in the interest of justice". If a trial judge feels, and so states for the record, that the jury verdict is contrary to the law and the evidence, then he must grant, upon proper motion, a new trial (under the clear provisions of C.C.P. Article 1972), having no authority to transfer to, or "allow" a court of appeal to hear a case "in the interest of judicial economy".
[2] In deciding Widcamp, we noted this Court's earlier decision in Hryhorchuk v. Smith, 379 So.2d 281 (La.App. 3 Cir. 1979), writs granted, 381 So.2d 1225 (La.1980), where we held Baumgartner applicable in a case where the pedestrian was standing on the side of the highway. In Hryhorchuk v. Smith, 390 So.2d 497 (La.1980), the Louisiana Supreme Court reviewed our decision in that case and went on to decide the issue of whether plaintiff (the pedestrian) had been contributorily negligent. That court found no evidence of any negligence on the part of the pedestrian.
[3] See footnote 5, infra.
[4] A "turn-out" is a railroad term used to describe what is commonly known as a switch. This is a device which allows a train to go from one track to another.
[5] A "block signal" is a signal operated by remote control which controls or protects a certain given area of track known as a block. If the signal is green, the train may enter and pass through the block protected by that signal. If it is yellow, the train may enter the block but must be prepared to stop at the next signal. If it is red, the train may not enter the block.
[6] This was referred to in the testimony as "big-holeing" the train. This releases all of the compressed air in the train's braking system and allows the brake shoes on each engine and car to press against the wheels creating the friction needed to stop the train. Also, when this is done, compressed air forces sand to flow out of special hoppers on the locomotives and onto the rails in front of the wheels, providing more friction to bring the train to a stop.
[7] A "whistle post" is simply a piece of silver reflective sheeting attached to a post. The shape of the sheeting is determined by the object being protected, i.e., a highway grade crossing, station, etc. They are placed to the right of the track and the engineer must sound the train's horn upon encountering a whistle post.
[8] LSA-R.S. 45:561 provides:

"§ 561. Equipment of locomotive with bell and whistle or horn, sounding of signals
Every railroad company or person owning and operating a railroad in this state shall equip each locomotive engine with a bell and a whistle or horn which, under normal conditions, can be heard at a distance of three hundred yards and, upon engines approaching at grade any street or highway crossing, whether or not said crossing shall be otherwise protected, shall, for a distance of not less than three hundred yards and until crossing is reached, cause either the bell to be sounded continuously or blasts of the whistle or horn to be sounded in the manner, provided by the Uniform Code of Railroad Operating Rules, unless the distance from that crossing and the start of that movement or the distance between crossings be less, in which event such warning signals shall be so sounded for that lesser distance; provided, however, that in cases of emergency said whistles or horn may be sounded in repeated short blasts. As amended Acts 1954, No. 395, § 1."
[9] Rule 98 of the same "Uniform Code of Operating Rules" requires trains to approach drawbridges at restricted speed, unless protected by block or interlocking signals. MoPac's bridge over the Red River is protected by block signals.
[10] Shelton happened to be a case involving the alleged negligence of a landowner. The analysis is applicable to all tort actions based on negligence.
[11] We have derived this duty from a number of cases involving accidents between pedestrians and trains in areas where the railroad and its employees had no knowledge that pedestrians are using the right-of-way as a pathway or crossing, or where it is infrequently used as such. These cases are: Gilliam v. Texas & Pacific Railway Co., 114 La. 272, 38 So. 166 (1905); Sizemore v. Yazoo & Mississippi Valley Railroad Co., 164 So. 648 (La.App. 2 Cir. 1935); Jenkins v. Harper, 221 So.2d 279 (La.App. 4 Cir. 1969); Sorey v. Yazoo & Mississippi Valley Railroad Co., 17 La.App. 538, 136 So. 155 (1931).
[12] We note that in discussing the duty of a landowner to others in Shelton, the court took into account the degree to which the dangers encountered by plaintiff were obvious. Shelton stated on page 410 that:

"The duty of a landowner is not to insure against the possibility of an accident on his premises, but rather to act reasonably in view of the probability of injury to others. Thus the landowner is not liable for an injury resulting from a condition which should have been observed by an individual in the exercise of reasonable care or which was as obvious to a visitor as to the landowner. Alexander v. General Accident Fire and Life Assurance Corp., supra [98 So.2d 730 (La.App. 1st Cir. 1957)], Crittenden v. Fidelity and Casualty Co., 83 So.2d 538 (La.App. 2d Cir. 1955)." (Emphasis ours.)
Walker relied heavily on the reasoning found in Shelton in formulating the duty owed to others by the owner of a facility (soybean/grain elevator).
[13] See Footnote 12, supra, for our discussion of the duties imposed on a landowner to others for dangerous conditions existing on his premises, which are as readily visible to visitors as they are to landowners. Of course, this applies to determinations of negligence, rather than strict liability.