_ AMY, Judge.
In this civil suit, the plaintiff alleged that Dr. Bruce Lobitz committed battery upon her. At trial, the jury found in favor of Defendants. The plaintiff now appeals. We affirm.
DISCUSSION OF THE RECORD
The plaintiff, Paula Louviere, filed suit alleging that Dr. Bruce Lobitz forced her to have unconsensual sex. In the petition, filed November 30, 1994, the plaintiff alleges that because of her weakened psychiatric state *1332 she was unable to offer forceful resistance. The plaintiff also alleges that she believed that she was in the need of medication which she claims Dr. Lobitz provided, in turn, after the alleged sexual encounter. Additionally, the plaintiff alleged that C & M Medical Services, Inc.[1], and Huey P. Long Medical Center[2] were jointly and severally hable for the factions of Dr. Lobitz. The alleged incident, from which this action arose, occurred on August 14,1994.
Much of the transcript from the six-day jury trial involves expert testimony related to the plaintiffs mental history and health. Additionally, a portion of the testimony is related to the actions of Huey P. Long Medical Center and C & M Medical Services, Inc. following notification of the alleged incident. However, the testimony reflecting the general history of the alleged incident, indicates that at the heart of this matter the parties relate vastly different versions of the incident, or absence thereof.
The plaintiff claims that, at the time of the incident, she was involved in an ongoing child custody dispute. Because the trial date for the custody matter was drawing near, the plaintiff testified that she became extremely nervous and anxious and, in the early morning hours of the day at issue, she tried to go to sleep, but could not because her heart was beating very rapidly. She testified that she became frightened and, after first calling the emergency room, decided that she needed to go to the hospital. Since her children were sleeping, she called her ex-boyfriend, Ed | .-¡Edwards to babysit at her home. She then proceeded to the emergency room at the Huey P. Long Medical Center in Pineville, Louisiana.
The plaintiff claims that, after arriving at the emergency room, she was shown to a room to wait for the doctor. After a period, Dr. Bruce Lobitz, a contract emergency room physician, entered the room and began the examination. The plaintiff stated that she confirmed that she was having difficulty breathing, that her chest was hurting and that she was experiencing stress in her life. She stated that Dr. Lobitz told her she was having an anxiety attack. She also testified that he related some personal information about himself and then asked: “What can I do for you?” She testified that she found both the personal information and the question peculiar. However, she responded that he could prescribe some medication for her nerves. The plaintiff then stated that Dr. Lobitz insinuated that he would give her medication in exchange for sex and that he inquired if the phone number and the address on her chart were correct. The plaintiff stated that the doctor’s proposition disgusted and shocked her and that soon thereafter, Dr. Lobitz left the examination room.
The plaintiff testified that the nurse returned with some Benadryl to take when she went home and a prescription for Vistaril, an additional antihistamine. She testified that she returned home, took the Benadryl and went to sleep with her children on the sofa in the front of the house.
The plaintiff said that she was awakened at approximately 7:00 a.m. by a knocking on the door. She testified that when she looked out, Dr. Lobitz was there and asked her if “this [was] a good time.” She stated that she told him that her boyfriend was in the other room and then she shut the door. Further, the plaintiff 14stated that, as she was shutting the door, Dr. Lobitz told her he would be back sometime during the day. Upon checking her telephone messages, she noticed there was a single call which, she testified, *1333 was from Dr. Lobitz. She farther testified that, in the message, he asked if he could come over. She testified that she wrote down the number of the incoming call, which was recorded on her telephone, and went back to bed. The record reveals that the telephone number, which the plaintiff noted, belonged to a pay phone located near the hospital.
The plaintiff testified that, when she awoke, she was frightened that Dr. Lobitz would return, so she called Rapides General Hospital. She stated that she was afraid to call Huey P. Long Hospital since that is where Dr. Lobitz worked. Upon calling Rapides General Hospital, she spoke with Sandra McSparin, a nursing supervisor, who testified that, after hearing the report of the plaintiff, she called the Huey P. Long Medical Center to get a reference person for the plaintiff to call. She then gave that information to the plaintiff when she called back later.
The plaintiff testified that after speaking with Ms. McSparin, she ealled Karen Williams, the Registered Nurse Manager at Huey P. Long Medical Center, and related her story. Following this phone call, she went to the pharmacy to have the prescription for Vistaril filled. She then ate lunch and took a dosage of the Vistaril. She and her children then went to an afternoon movie. However, the plaintiff testified that they had to leave mid-way through the movie and return home because the medication had made her very drowsy.
Upon arriving home, the plaintiff took a nap, but, before doing so, she instructed her daughter to not answer if a doctor came to the door. She stated that she |swas later awakened when her daughter came to her room to tell her there was a doctor at the door and that, at the same time, she could hear the doctor “banging” at the front door. The plaintiff testified that she began getting dressed and told her daughter to not let the doctor into the house. She stated that she then heard her daughter speaking with Dr. Lobitz who had apparently entered the house and that Dr. Lobitz told Andrea to go outside and play, which Andrea did. Further, the plaintiff testified that Dr. Lobitz came into the bedroom and attempted to force her to perform oral sex. She stated that, after this failed, he put on a condom, forced her onto the bed, and had sexual intercourse with her. She said the entire event lasted only a few minutes.
The plaintiff testified that after performing intercourse, the doctor threw the condom into the bathroom waste basket, which she emptied the next day. She stated that Dr. Lobitz returned to the bedroom, pulled a prescription sheet from his pocket and asked her what kind of medication she wanted. She responded that Ativan would be fine. The plaintiff testified that Dr. Lobitz finished writing the prescription and laid it on the dresser and then told her that he would be back next month for her refill on the medication.
The plaintiff ealled several witnesses to support her version of events. The plaintiffs daughter, Andrea Lewis, confirmed that her mother had told her to not let a doctor in and that later, a man wearing a hospital scrub suit knocked at the door. However, she did not let him inside, but, instead, returned to watching cartoons on television. She testified that the doctor then walked into the kitchen and that she became frightened. Andrea stated that she then went to get her mother. She also stated that the doctor told her to go outside and play and that when she looked at her | (¡mother, she felt that her mother wanted her to go outside as well. Andrea testified that while she was riding her bicycle over to a friend’s house, she noticed a “hunter green” vehicle in the parking lot near the house. She said that it was a vehicle like a Blazer or Cherokee. Dr. Lobitz testified that he owned a green Jeep Cherokee. Mildred Lewis, the plaintiffs mother and Andrea’s grandmother, testified that Andrea related the same version of events to her the next day and that Andrea does not lie.
Andrea’s testimony, however, was not unchallenged. Defense counsel noted several differences in her trial testimony and that taken in deposition. For instance, in deposition she testified that she and her brother slept in their mother’s bedroom the night of the incident whereas, at trial she stated that *1334 they slept on the sofa. Additionally, she testified that the man at the door had a mustache whereas, there was no additional testimony that Dr. Lobitz had a mustache at that time. Finally, although Andrea initially identified Dr. Lobitz as the man who came into the house, the record indicates that, during a trial recess, Andrea began crying and was unable to further testify as to what happened. The trial judge explained this occurrence to the jury by stating that the parties had agreed to stipulate to what Andrea would testify to if she could continue. By agreement of the parties, the trial judge gave the parties’ stipulation as to Andrea’s testimony as follows:
She said that the thing that upset, made her cry, was that she thinks she might have made a mistake, that she cannot identify Dr. Lobitz as the man that was in her house. That Dr. Lobitz is bigger than the person that was in her house, and that his hair was blonde, and he was heavier than the man who came in her house, and basically that’s what we have agreed that she would say if she testified at this time.
|7 The plaintiff also called to the stand, Ed Edwards who identified himself as the plaintiff’s ex-boyfriend. He stated that he had received a call from the plaintiff on the night of the hospital visit and that he went to her house to stay with the children. He testified that he slept in the plaintiff’s bedroom while the children slept on the sofa. He stated that he was awakened at approximately 7:00 a.m. by knocking at the door. He stated that he went to the window and saw a man in “bluish” colored scrubs leaving the house. He testified that he did not think anything of it at the time, but related seeing this after hearing of the plaintiffs claim. He testified that, although there was a bush covering approximately three-fourths of the window, he was able to see the male figure by peering through the bush. Additionally, William Jones, who lived next door to the plaintiff at the time of the alleged incident, stated that he too saw a man dressed in scrubs at the plaintiffs house.
Dr. Lobitz stated that he began working at Huey P. Long Medical Center in Pineville in May 1994 and that, on the night of the alleged incident, he was working a shift which began at 7:00 p.m. and which ended at 7:00 a.m. He stated that he first came in contact with the plaintiff when a nurse handed him a chart and he went into the examination room where the plaintiff was waiting. Dr. Lobitz testified that she was asleep and that he recalled her primary complaint was chest pain and further, that she complained of being unable to sleep. Dr. Lobitz further testified that he then took a medical history from her and was aware of her mental health history, which included a prior diagnosis of schizophrenia, and that the plaintiff told him that she would be unable to return to the mental health clinic to visit a psychiatrist for another month. Dr. Lobitz testified that the plaintiff asked him if he performed “safe sex.” | «He stated that he thought that this preoccupation was consistent with the prior schizophrenia diagnosis. He testified that he prescribed Benadryl to help the plaintiff sleep and wrote a prescription for Vistaril for her to have filled the next day. These prescriptions were entered onto her medical chart. He stated that he then left the examining room and returned later, surprised that she was still in the hospital. Dr. Lobitz testified that the plaintiff had once again fallen asleep in the examining room. He stated that he began to think about her claim that she would not be able to return to the mental health clinic for a month and decided that he would prescribe Ativan. He stamped her hospital card using the stamping machinery located in the emergency room which indicates that he had written the prescription at the hospital, however, he did not enter this onto her chart. The plaintiff maintains that the failure to note the prescription on the chart is evidence that the prescription was not written until later, at her home. However, Dr. Lobitz contends that it was simply a “late entry” which could have been recorded later. Dr. Lobitz also maintains that the hospital machine stamp located on the card is evidence that the prescription was written at the hospital since the machinery is large and, otherwise, would have to have been carried with him to the plaintiffs house.
Dr. Lobitz testified that he left the hospital after 7:00 a.m. that morning and had no further contact with the plaintiff. He denied *1335 propositioning the plaintiff, calling her, going to her house, or having sexual relations with her.
Charlene Nichols, a nurse at the medical center at the time of the incident, testified that she was working there that night and helped Dr. Lobitz with the plaintiff. She testified that she entered the room several times and that the door to the ^examining room remained partially opened. She stated that Dr. Lobitz instructed her to give the plaintiff two Benadryl tablets, which she did, and that he gave the plaintiff the prescription for Vistaril. She stated that she did not recall any discussion regarding Ativan and further, remembered nothing unusual from that evening. Finally, Nichols testified that she and Dr. Lobitz finished their shift and left the hospital together, after 7:15 a.m.
The defense also brought out evidence related to the plaintiffs extensive history of mental health problems. The record indicates that the plaintiff had previously been hospitalized at psychiatric facilities and was diagnosed, during one period, as suffering from paranoid schizophrenia. She was later diagnosed with schizo-affeetive disorder. Additionally, the psychological testimony indicates that the plaintiff had suffered from psychotic episodes and that she was particularly vulnerable during times of stress.
The defense presented testimony in an attempt to show that the plaintiff had a history of making sexual-related allegations. The record indicates that the plaintiff had previously accused her three ex-husbands of molesting her children, two of which she herself stated were otherwise unsubstantiated. Additionally, Elizabeth Courtney, a former neighbor of the plaintiffs, testified that the plaintiff had accused her of having an affair with her boyfriend.
Obviously, at trial, the jury was called upon to resolve important.questions of credibility concerning the widely varying testimony presented in this case. However, following this six-day trial, the jury returned a 9— 3 verdict in favor of the defendants. The plaintiff now appeals and assigns the following as error: 1) The trial court erred Loby amending the special verdict form after commencement of jury deliberations to add the language “without her consent” to the first interrogatory; and 2) The trial court erred by permitting irrelevant and significantly prejudicial questions and testimony regarding appellant’s past conduct. As the plaintiff argues that the trial court committed legal error encompassed by the two assignments, she also asks this court for a de novo review of the record asserting that judgment should be entered in her favor. Accordingly, much of the plaintiffs brief targets the merits of the case now before us. However, as we find these two assignments of legal error merit-less, for the reasons discussed below, we decline to conduct a de novo review.
LAW
Amendment of Verdict Form
The trial court charged the jury as to the law on battery, the claim made against Dr. Lobitz in this case. The trial court stated the following:
Plaintiff, Paula Louviere, alleges that the defendant, Dr. Lobitz, committed a sexual act on her either under duress or against her will. In the law of civil liability such an act falls under the broad heading of a battery. Battery is defined in law as a harmful or offensive contact with a person resulting from an act intended to cause the plaintiff to suffer such a contact. The intention need not be malicious nor need it be an intention to inflict actual damage. It is sufficient if the actor intends to inflict either a harmful or offensive contact without the other’s consent. Accordingly, to find that the defendant, Dr. Lobitz, committed a battery on the plaintiff, you must find that Dr. Lobitz committed a harmful or offensive contact with Paula Louviere with the intent to cause her to suffer such contact. These are elements of a battery.
Further, the verdict sheet given to the jury originally contained the following interrogatory:
1) Do you find that Dr. Bruce Lobitz committed a sexual act on Paula Louviere?
| nAfter receiving the verdict sheet, the jury retired to deliberate. However, the jury returned to the courtroom for the judge *1336 to answer a question. The jury foreperson, Mr. Carter, asked the following:

BY MR. CARTER:

On Question Number 1, we were debating and we weren’t sure among ourselves as whether a sexual act, some of us were under the impression that was a rape or illegal sexual act or repeated sexual act and we wondered if you could clarify that for us.

BY THE COURT:

Is it my instructions that gave you a problem?

BY MR. CARTER:

No, it’s Question 1 on our sheet.

BY THE COURT:

I guess what I better do is ask /all to go back in your room and I’ll discuss this with the lawyers. This is a-it’s vague.
The jury then left the courtroom. The record reflects that the attorneys and the trial judge attempted to resolve the jurors’ confusion. Despite the objection of plaintiffs counsel, the trial judge decided to add “without her consent?” to the end of the first interrogatory. Following this inclusion, the interrogatory read as follows:
1) Do you find that Dr. Bruce Lobitz committed a sexual act on Paula Louviere without her consent?
Additionally, the trial judge once again charged the jury as to the elements of battery. The same definition previously read to the jury by the trial court was used.
The plaintiff now argues that the trial court erred by amending the special verdict to include the words “without her consent” to the interrogatory. The plaintiff | ^maintains that the issue of consent had been withdrawn by Dr. Lobitz’s admission and that the defense had specifically asked that the term “consent” not be used on the verdict form. Further, the plaintiff argues that adding to the special verdict form only emphasized a portion of the offense that was not in question.
La.Code Civ.P. art. 1796 provides the guidelines for a trial judge to follow when giving a jury additional instructions. That article provides:
A. If the jury, after retiring for deliberation, desires to receive information on any point of law, they shall be conducted to the courtroom.
B. After giving notice to the parties, the court may give the appropriate instructions.
C. The court, after giving notice to the parties, may recall the jury after they have retired:
(1) To correct or withdraw an erroneous instruction.
(2) To clarify an erroneous instruction.
(3) To inform the jury on a point of law which should have been covered in the original instructions.
(4) To give such further instructions as may be appropriate.
Further, this court has previously addressed the adequacy of a trial court’s jury instructions holding:
Adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Evangeline Farmers Cooperative v. Fontenot, 565 So.2d 1040 (La.App. 3rd Cir.1990); Kaplan v. Missouri-Pacific Railroad Co., 409 So.2d 298 (La.App. 3rd Cir.1981). The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; he must, however, correctly charge the jury. Oatis v. Catalytic, Inc., 433 So.2d 328 (La.App. 3rd Cir.), writ denied, 441 So.2d 210, 215 (La.1983). An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5th Cir.), writ denied, 434 So.2d 1097 (La.1983).
Doyle v. Picadilly Cafeterias, 576 So.2d 1143, 1152 (La.App. 3 Cir.1991).
In Caudle v. Betts, 512 So.2d 389 (La.1987), the supreme court identified the elements of a battery which must be proven in a civil suit. The court stated: “A harmful or offensive contact with a person, resulting *1337 from an act intended to cause the plaintiff to suffer such a contact, is a battery.” Id. at 391.
As stated in Doyle, the trial judge has the duty to correctly charge the duty. We do not find that, in the present case, the trial judge failed to do so as the charge given was exactly that explained in Caudle. The amendment to the interrogatory appropriately reflected these elements of battery which were twice recited to the jury. We do not find that inclusion of the consent element in the interrogatory was erroneous, but was, instead, required of the trial judge. Accordingly, we find no merit in this argument by the plaintiff.
We additionally find no merit in the plaintiffs contention that the defendants had withdrawn the issue of consent or that this element had been admitted. Judicial confession is defined at La.Civ.Code art. 1853 which provides:
A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it.
A judicial confession is indivisible and it may be revoked only on the ground of error of fact.
After reviewing the record, we find that Dr. Lobitz made no confessions or admissions with regard to consent. Instead, the consent issue remained as an element _Ji4required to be proven by the plaintiff. The following exchange took place between the plaintiff’s counsel, Mr. Faircloth, and Dr. Lo-bitz during the doctor’s testimony.
Q It is your position, sir, is it not, that you did not go to Paula Louviere’s house on August 14th, 1994?
A That’s correct.
Q So, you are not taking the position that she consented to sex, are you, sir?
A That’s correct, I’m not.
We do not find that this response, elicited by the plaintiffs counsel, constitutes an admission regarding the issue of consent. Accordingly, this assignment is without merit.
Testimony Regarding Past Conduct
The plaintiff next argues that the trial court erred by allowing character testimony of the plaintiff into evidence. She claims that this information was irrelevant and highly prejudicial. In particular, she cites testimony related to her prior treatment for syphilis and questioning related to her theft of artwork from an employer during a stressful period. The plaintiff argues that this information, along with testimony regarding other sexual-related allegations made by the plaintiff were prejudicial.
La.Code Evid. art. 403 provides the following:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
| i5Further, the admissibility of character evidence is also addressed in the Louisiana Code of Evidence. Although Article 404 generally prohibits the admission of evidence relating to a person’s character, Article 404(B) also provides certain instances in which character evidence is admissible.
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of notice, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
An appellate court must place great weight on the trial court’s ruling of relevancy of evidence and should not reverse that ruling absent a clear abuse of discretion. Krampe v. Krampe, 625 So.2d 383 (La.App. 3 *1338 Cir.1993), writ denied, 93-2763 (La.1/7/94); 630 So.2d 781.
In the present ease, the trial court declined to initially rule on all of the evidence the plaintiff sought to exclude, but instead decided to see how the testimony developed. The trial court then considered, on several occasions, the admissibility of any evidence of the plaintiffs past actions. Upon objection of the plaintiffs attorney, the following exchange took place:

BY MR. FAIRCLOTH:

Judge, if that’s the ease I’ll just enter my objection right now to all of the character evidence because it sounds like it is just going to 1 KjCOme pouring in. I mean, I filed my Motion in Limine, I tried my best to exclude it, not one single thing in Paula Louviere’s past has been excluded from this trial, and they are going to just bring it all in, and so I’ll just enter my objections as they come in, Your Honor.

BY THE COURT:

All right, let the objection be entered. The Court rules that any past conduct of Mrs. Louviere’s that sets a pattern, or a motive, or is similar to that which is alleged in this case, and not the act itself, but the fact that the act was committed at the time where she was disoriented, and not in control of the things she did, is admissible.

BY MR. FAIRCLOTH:

Okay, do they have to prove — because see, they are just going to ask — they are just going to fish when she gets on the stand.

BY THE COURT:

They don’t have to prove — if the act is alleged, that she did something because she was disorientated and that his is her normal conduct when she becomes disorientated, and anxiety, full of anxiety, and she denied that she did something during that time, then they can introduce evidence to show that she did, in fact, do something during that time.

BY MR. FAIRCLOTH:

Judge, but under 403, any slight probative value is grossly out weighed by the prejudicial effect because the similarity between those things is absent to this ...

BY THE COURT:

... But I don’t think this is slight probative value.
We do not conclude that the trial court abused its discretion by allowing into evidence the testimony of which the plaintiff now complains. Much of the testimony relates to the plaintiffs actions during stressful periods, ie., the allegations against her ex-husbands for molestation of her children, and the theft of art. The jury also | ^heard evidence from mental health professionals that the plaintiff tended to decompensate during times of stress. As the plaintiff indicated that she was under great stress at the time of the alleged incident with Dr. Lobitz, we find no error in the trial court’s relevancy determination. Rather, we find support for the trial court’s conclusion that this evidence related to a pattern in the plaintiffs behavior.
Additionally, we find no reversible error in the trial court permitting the testimony regarding the plaintiffs treatment for syphilis. The following colloquy was heard by the jury with regard to the treatment:
[By counsel for Dr. Lobitz]
Q Tell the jury when the first contact you had with Paula Louviere was?
[Nurse Charlene Nichols]
A The first contact I had with Mrs. Louvi-ere was in October of ’87, when she •presented to the Labor and Delivery Department with an intrauterine fetal demise and syphilis.
Q You specifically recall that?
A No, I read it in the chart, and that was what she she was admitted for.
Q Okay, so the baby died because of the syphilis?
A Well, I can’t make ...

BY MR. FAIRCLOTH:

You Honor, I’m going to object, I mean, I just — I’ve done everything I can to prevent this type of stuff from coming into this trial, and I’ve unsuccessfully done it, I mean, I just ...

11HB Y MR. CESPIVA;

*1339 ... Your Honor, it is going to come in in our ease in chief with Dr. Ware testifying about the syphilis and how it effected her thinking.

BY MR. FAIRCLOTH:

No, no, that’s not,, he is offering it because it is embarrassing to Mrs. Louviere, and that’s why I’ve objected to it over and over.

BY MR. CESPIVA:

I’m going to go — I’m not, Your Honor
[[Image here]]

BY THE COURT:

Well, let me stop this just a minute. The witness right now is under cross examination, are you taking her under direct at this time?

BY MR. CESPIVA:

Yes sir.

BY THE COURT:

Are do you want to wait until your case in chief.

BY MR. CESPIVA:

I want to take her under direct.

BY THE COURT:

All right, then I will caution you not to lead the witness.

BY MR. CESPIVA:

Okay, I was just asking her ...

BY MR. FAIRCLOTH:

Your Honor, my objection wasn’t to leading, my objection was to ...

119BY MR. WEIL:

... May we approach the bench, Your Honor?

BY THE COURT:

Yes sir.

CONFERENCE AT THE BENCH

[[Image here]]
[[Image here]]
Following this bench conference, the plaintiffs condition was not discussed again before the jury. The plaintiff maintains that this information is irrelevant and prejudicial since the defendant put on no evidence linking syphilis with mental health, as was promised by defense counsel at the time of the questioning. Despite this failure, we conclude that, assuming arguendo that error occurred, any error which may have resulted was harmless given the limited nature of the questioning on the subject and the broad discretion given to the trial judge in determining relevancy and prejudicial effect. See Strawder v. Zapata Haynie Corp., 94-453, 94-454 (La.App. 3 Cir. 11/2/94); 649 So.2d 554; Krampe, 625 So.2d 383. We further note that the plaintiffs counsel did not request any limiting instruction from the trial judge to the jury regarding the witness’ testimony. Accordingly, we find the plaintiffs second assignment of error to be without merit.
CONCLUSION
As we find merit in neither of the plaintiffs assignments, we need not conduct a de novo review. Neither need we address the liability of either Huey P. Long Medical Center or C & M Medical Services, Inc., as any issue related to their liability Rpis moot by our disposition of this case and affirmation of the judgment of the lower court.
DECREE
For the foregoing reasons, the judgment of the lower court is affirmed. All costs of this appeal are assessed to the plaintiff, Paula Louviere.
AFFIRMED.
WOODARD, J., concurs in the result.

. The record indicates that Dr. Lobitz was directly contracted by C & M Medical Services, Inc. which provided physicians’ services for the emergency room at Huey P. Long Medical Center. The plaintiff alleged that C & M Medical Services, Inc., was liable for the acts of its alleged employee, Dr. Lobitz, pursuant to La.Civ.Code art. 2320.

. The alleged incident in the present case began when the plaintiff sought treatment at the emergency room of the Huey P. Long Medical Center in Pineville, Louisiana. The plaintiff alleged that the hospital was liable for failing to protect her pursuant to La.Civ.Code art. 2315. Additionally, the plaintiff asserted that the hospital was liable pursuant to La.Civ.Code art. 2320, however, this claim was dropped at trial when the parties stipulated that Huey P. Long Medical Center was not the employer of Dr. Lobitz.