STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

07-1151

CADE HARPER HOWELL, ET AL.

VERSUS

UNION PACIFIC RAILROAD COMPANY, ET AL.

**********
APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 66186-A
HONORABLE JOHN LARRY VIDRINE, DISTRICT JUDGE
**********

**GLENN B. GREMILLION**
**JUDGE**

**********

Court composed of Glenn B. Gremillion, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED.**

**M. Terrance Hoychick**
**Hoychick & Aguillard**
**P. O. Drawer 391**
**Eunice, LA 70535-0391**
**(337) 457-9331**
**Counsel for Plaintiffs/Appellants:**
    **Jeanette Young**
    **Frederick Young**
    **Patricia A. Smith**
    **Dwayne Smith**
    **Lynn D. Howell**
    **James F. Howell**
    **Cade Harper Howell**

**Richard J. Arsenault**
**Neblett, Beard & Arsenault**
**P. O. Box 1190**
**Alexandria, LA 71309-1190**
**Counsel for Plaintiffs/Appellants:**
> **Jeanette Young**
> **Frederick Young**
> **Patricia A. Smith**
> **Dwayne Smith**
> **Lynn D. Howell**
> **James F. Howell**
> **Cade Harper Howell**

**John E. McElligott, Jr.**
**Davidson, Meaux, Sonnier & McElligott**
**P. O. Box 2908**
**Lafayette, LA 70502-2908**
**(337) 237-1660**
**Counsel for Defendants/Appellees:**
> **Keir N. Nero**
> **Armando Lazo**
> **William Joseph Thibodeaux**
> **Joseph Wayne Curtis**
> **Ernest Selders, Jr.**
> **Union Pacific Railroad Company**

GREMILLION, Judge.

In this case, the plaintiffs, Cade Howell, James and Lynne Howell, Dwayne and Patricia Smith, and Frederick and Jeannette Young, appeal the judgment of the trial court in favor of the defendants, Union Pacific Railroad Company, Ernest Selders, Jr., Joseph Wayne Curtis, William J. Thibodeaux, Armando Lazo, and Keir N. Nero.[1]  For the following reasons we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Bayou Nezpique flows west of the Howell residence and Union Pacific's railroad line runs east and west just north of the residence.  The train involved in this accident was traveling east through the town of Elton, Louisiana and then across the Barnsdale Road crossing, located approximately 6,300 feet from the Bayou Nezpique Bridge.  After crossing Barnsdale Road, the train approaches a curve.  About a half mile away from the curve is the Bayou Nezpique Bridge, which is approximately one thousand feet long.

In August 2003, Cade, Owen, and Corey left a party at the Howell residence on foot to go hunting. The boys walked through the woods toward Bayou Nezpique and entered the bridge on its east side to cross the bayou.  Tragically, a Union Pacific train, whose engineer was Lazo and whose conductor was Nero, struck Owen and Corey killing them.  Cade was able to safely escape the bridge and was uninjured.

---

[1] James and Lynn are the parents of Cade Howell, born July 25, 1986.  Dwayne and Patricia are the parents of Owen Smith, born May 18, 1987.  Frederick and Jeannette Young are the parents of Corey Young, born August 28, 1986.

1

In July 2004, the plaintiffs filed suit against multiple defendants urging their negligence surrounding the train, the track, and their knowledge of the surrounding area. The defendants filed a motion for summary judgment in January 2006, which was denied. Thereafter, the defendants filed a Motion to Stay Proceedings while a writ application to the this court was pending. We denied the writ. The defendants then filed a writ application with the supreme court, which was also denied. The defendants then filed a partial exception of no right of action urging that Cade could not claim damages for witnessing the death of his friends because he was not one of the classes of persons who may recover such damages pursuant to La.R.S. 2315.6. Both the plaintiffs and the defendants filed Motions in Limine pertaining to numerous evidentiary issues.

The matter was tried before a jury from January 8-19, 2007. At the close of the plaintiffs' evidence, the defendants filed a motion for directed verdict, which was denied. At the conclusion of the trial, the jury returned a verdict finding that none of the defendants were negligent. The plaintiffs moved for a motion for judgment notwithstanding the verdict and in the alternative, for a new trial, which was denied. The plaintiffs now appeal.

**ISSUES**

The plaintiffs assign as error:

1. The trial court's instructions to the jury.

2. The trial court's denial of their motion in limine precluding the defendants use of photographs or videos, the purpose of which was to demonstrate to the jury what can be seen with the naked eye.

2

3.     The trial court's admission of a video from a train passing through the accident scene and a video animation prepared and presented by the defendants.

4.     The jury's determination that the train crew was not negligent.

5.     The jury's determination that Union Pacific was not negligent.

6.     The jury's determination that Joseph Curtis, Ernest Selders, and William Thibodeaux were not negligent.

7.     The trial court's denial of their post-trial motions.

## DISCUSSION

### *Jury Instructions*

In their first assignment of error, the plaintiffs assert that the trial court erred in refusing to give their requested jury charges numbered 1, 4, 13, 19, and 20 and in allowing the defendants charges 1 and 2. Louisiana Code of Civil Procedure Article 1793(C) (emphasis added) states:

> A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, *stating specifically the matter to which he objects and the grounds of his objection.* If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.

At the conclusion of the trial, the plaintiffs lodged their objections as follows:

> The Plaintiffs Your Honor object on the following instructions not being given, that's jury instruction one of the plaintiffs, jury instruction number four, jury instruction number seven, jury instruction number 13, jury instruction number 19, jury instruction number 20, and those are our objections Your Honor for the plaintiffs.

3

And regarding the defendants' jury charges that the Court did allow, plaintiffs object to defendant's jury charge number one, train's crew has no duty to slow the train upon the near sighting of an object on the track[.] It's our position that this is a bridge and therefore that particular area of the law does not apply and that would be the same thing with jury charge number two, a train's crew has no duty to slow or stop a train upon the sighting of an object or even a person on or near the railroad tracks ahead, the same objection Your Honor.

As pointed out by the defendants, the plaintiffs did not offer any additional information providing the specificity required of Article 1793(C) concerning the trial court's failure to give the plaintiffs' requested jury charges. This is simply insufficient to preserve the objection for review on appeal. *See Tatum v. Old Republic Ins. Co.*, 94-157 (La.App. 3 Cir. 10/5/94), 643 So.2d 419, *writ denied*, 94-2722 (La. 1/6/95), 648 So.2d 929. For that reason, this portion of the assignment is not properly before us and we will not consider it.

On the other hand, we do find that plaintiffs properly preserved their objections relating to defendants' jury charges numbered one and two. In reviewing those jury instructions, we find the trial court did not abuse its discretion in instructing the jury as it did. In brief, the plaintiffs claimed that the instructions in question stated:

**Defendants Jury Charge No. 1**: A train has the right of way when traveling on railroad tracks and its crew has a legal right to operate the train within the track's speed limit as determined by the Federal Railroad Administration. A train's crew has no duty to operate the train at a slower rate of speed to protect pedestrians who decide to walk on the railroad track.

**Defendants Jury Charge No. 2**: A train's crew has no duty to slow or stop a train upon the sighting of an object, or even a person, on or near the railroad tracks ahead.

However, the trial court apparently rejected those charges by omitting language and combining the two charges to read:

> A train has a right of way when traveling on railroad tracks and its crew has a legal right to operate the train within the track's speed limit as determined by the Federal Railroad Administration. A train's crew has no duty to slow the train upon the mere sighting of an object on the track.

On appeal, the plaintiffs' argument centers around the train crew's duties upon seeing objects *on a bridge* portion of a railroad track. The plaintiffs do not dispute the law as it pertains to a train crew's duties when seeing pedestrians on regular railroad tracks. In *Evans. v. Tudor Construction*, 95-1029, p. 6 (La.App. 3 Cir. 1/31/96), 670 So.2d 447, 452, (citations omitted) (emphasis in original) we stated:

> Adequate jury instructions are those which fairly and reasonably point up issues and which provide correct principles of law for the jury to apply to those issues. Although the trial judge must give instructions which properly reflect the law applicable in light of the pleadings and facts in each particular case, he is not required to give the instructions exactly as requested. Neither is the judge required to give **all** the law available on the subject in question. He is only required to instruct the jury as to the law that is pertinent to the case and, to do so in terms that the jury can easily comprehend and apply to the evidence before it. The adequacy of the jury instructions must be determined in light of the instructions as a whole. An appellate court must exercise great restraint before overturning a jury verdict because the instructions were so erroneous as to be prejudicial.

> Having examined the totality of the jury instructions and more particularly, the law as discussed below, we do not find that the trial court abused its discretion in instructing the jury as it did. Accordingly, this assignment of error is without merit.

### *Evidence*

In assignments of error two and three, the plaintiffs urge that the trial

5

court erred in allowing the defendants' use of photographs or videos, the purpose of which was to demonstrate to the jury what can be seen with the naked eye, and in admitting a video from a train passing through the accident scene and a video animation prepared and presented by the defendants. We recently stated in *Gold, Weems, Bruser, Sues, & Rundell v. Granger*, 06-589, p. 9-10 (La.App. 3 Cir. 12/29/06), 947 So.2d 835, 843, *writ denied*, 07-0421 (La. 4/27/07), 955 So.2d 687 (citations omitted):

> A trial court is given vast discretion in its ruling on the admissibility of evidence, including whether or not witness testimony is relevant and admissible.
>
> > The district court is given vast discretion in its decisions on evidentiary rulings and its decision to admit or exclude evidence will not be reversed on appeal unless it is clearly shown that it has abused that discretion.
> >
> > We cannot overturn a trial court's rulings on the admissibility of evidence unless those ruling were clearly wrong or we find that the trial court abused the vast discretion it is accorded.

More specifically, the introduction of videotape evidence is within the discretion of the trial court and, absent an abuse of discretion, we will not overrule its ruling regarding the admissibility of evidence. *Lee v. Autom. Cas. Ins. Co.*, 96-517 (La.App. 3 Cir. 11/6/96), 682 So.2d 995, *writ denied*, 96-2949 (La. 1/31/97), 687 So.2d 409. Having carefully reviewed the entire record, we cannot find that the trial court abused its discretion in the admission of the videos and photographs.

The defendants' photographs are a series of photographs that were taken of the bridge and the video was taken inside of a locomotive traveling through the accident area at the same speed at which the train in question was traveling and taken at approximately the same time of year as the accident in question. Multiple

6

witnesses testified that the photographs accurately depicted the view of the area surrounding the bridge and track. Indeed, having reviewed the photos and videos, they appear to depict the general location of the accident area and nothing else. As to these photographs, the plaintiffs provided expert testimony as to the difference between what one can see via a photograph versus the naked eye and had ample opportunity to discredit the photographs or provide their own superior photographs.

The computer animation video was used to illustrate an expert's opinion. The video showed an aeriel view of the train traveling past the Barnsdale crossing up through the time of impact and illustrated, based on information taken from the event recorder, when the horn was blown and at what point various braking services began. It also depicted the expert's best estimation as to the location of the boys and the speed at which they ran away from the train. Plaintiffs had ample opportunity to cross-examine the witness and his methodology pertaining to the filming of the video and the variables the video presented and, indeed, our review reveals that the witness was questioned in detail regarding these issues. In the context in which this evidence was presented the trial court did not abuse its discretion. Accordingly, these assignments of error are without merit.

### *Negligence*

In assignment of errors four and five, the plaintiffs urge that the jury was manifestly erroneous in finding that the train crew and Union Pacific, respectively, were not negligent.

As to the train crew, the plaintiffs urge that Lazo and Nero were negligent in the following ways:

7

1.  Failure to place the train in emergency when they identified or should have identified the three boys on the bridge.

2.  Failure to slow the train when seeing objects on the bridge which they could not identify.

3.  Failure to know long it would take to stop the train.

4.  Violating Rule 1.1.1 of the General Code of Operating Rules (GCOR).

As to Union Pacific, the plaintiffs urge that the evidence unequivocally proved that it was negligent in three areas:

1.  By teaching its employees that they are to maintain their speed until they can clearly identify the object.

2.  By failing to report evidence of pedestrian activity.

3.  By not informing engineers and conductors of prior accidents on the bridge.

As to assignment of error number six, the plaintiffs urge that it was error for the jury to find that Inspectors Curtis, Selders, and Thibodeaux were not negligent because they were in the best position to report seeing pedestrians on the bridge.

We will not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.* Though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable inferences of fact should not be disturbed upon review where

8

conflict exists in the testimony. Id. "Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Stobart v. State Through DOTD*, 617 So.2d 880, 883 (La.1993). "[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Id*. at 882.

In any negligence action, the plaintiff must prove all four elements of the duty-risk risk analysis in order to recover including that the conduct in question was a cause-in-fact of the resulting harm, that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the risk of harm was within the scope of protection afforded by the duty breached. *Duncan v. Kansas City S. Ry. Co.*, 00-0066 (La. 10/30/00), 773 So.2d 670.

It has been previously held by this court and many others that:

> [A] pedestrian has no right to be on the right-of-way, which is essentially private property. . . . There is a long line of jurisprudence in this State to the effect that an engineer, when sighting a person or a vehicle on the track, can presume that he or it will move from the position of danger upon the sounding of the train's bell or the blowing of its whistle or horn; and, that it is only when the engineer realizes that the warning are not going to be heeded that he should make an effort to stop the train.

*Kaplan v. Missouri-Pac. R.Co.* (La.App. 3 Cir. 1981), 409 So.2d 298, 306 (citations omitted).

The supreme court, in *LeJeune v. Union Pacific Railroad*, 97-1843, p. 8 (La. 4/14/98), 712 So.2d 491, 495 (citations omitted), has set forth the same premise in relation to motorists approaching a railroad crossing:

> It is well established in our jurisprudence that a train crew can presume that vehicles approaching railroad crossings will obey the law and stop in time to avoid an accident. The train need not slow down at all or

9

attempt to stop upon seeing a vehicle approaching an upcoming crossing. It is only if a crew member notices that 'the driver of the approaching car is oblivious of the on-coming train or for some other reasons does not intend to stop' that the train crew becomes responsible for immediately doing everything in its power to avert the collision.

We find that this reasoning is applicable to the situation of a pedestrian on a railroad track or trestle. Thus, it is clear that the engineer's duty to stop the train only comes into play once he realizes that a) there is a pedestrian on the bridge, and b) the pedestrian has not heard his warnings or is ignoring them.

Additionally, a landowner's duty does not extend to every risk that a person may encounter. On the contrary, the landowner need only act

reasonably in view of the probability of injury to others. *Thus the landowner is not liable for an injury resulting from a condition which should have been observed by an individual in the exercise of reasonable care or which was as obvious to the visitor as to the landowner.*

*Kaplan*, 409 So.2d at 314, f.12, quoting *Shelton v. Aetna Cas. & Sur. Co.,* 334 So.2d 406, 410 (La.1976) (emphasis in original). A bridge designed to transport trains over a bayou poses an open and obvious danger to anyone who sees it. *Id.* A reasonable person has a duty to avoid such open and obvious dangers. The testimonial evidence at trial was voluminous and is summarized below.

Felix Velasquez, the Director of Operating Practice/Safety for Union Pacific, testified that he has worked for the railroad for over thirty years. Velasquez testified regarding the event recorder (or black box) retrieved following the accident. Velasquez discussed the data he recovered from the event recorder and stated that it showed proper train handling within the rules of the railroad. He testified that the time that elapsed from the initial blowing of the horn until the emergency brake was

10

used was thirty to thirty-one seconds during which time the train traveled a little over 2000 feet.

Armando Lazo, a Union Pacific train engineer since 2002, testified as to the emergency braking system of the train. He stated that it takes much longer to stop a train than a vehicle because each of the train cars must be stopped. He testified that he noticed a bright-colored object on the track, sounded the horn, and waited for a reaction, and when there was none he instituted the emergency braking system. He testified that he has traveled over the Bayou Nezpique Bridge several times and has never seen any object or people on the bridge. Lazo said that as soon as he identified that it was people who were running away from the train, he put the train in emergency.

James Herring, a member of the Union Pacific Railroad Police Department and Senior Special Agent Investigator for twenty-five years, testified that the Basile location was within his territory. He stated that he has never arrested anyone nor given anyone a citation for trespassing on the bridge. Herring testified that there were no signs anywhere near the bridge advising people that the bridge is private property and to stay off. He testified that, in 2002, he made nineteen inspections of the bridge and never saw anyone on or near the Bayou Nezpique Bridge. In 2003, he made eleven inspections and never saw anyone on or near the bridge.

Joseph Curtis, a retired track inspector with Union Pacific, had inspected the Basile area from 1990 through September of 2002, when he retired. He stated that he had inspected the Bayou Nezpique Bridge more than fifty times over the course

11

of his career. Curtis said that if he sees graffiti he is to report it, but he testified that he never noticed the marking on the bridge until counsel pointed it out to him. Curtis stated that he never saw pedestrians on the track or anywhere near the bridge.

James Myers, the manager of bridge maintenance at Union Pacific, testified that he was responsible for the Bayou Nezpique Bridge area beginning in 2001, but he only inspected the bridge once before the accident. Myers said he saw the markings on the steel, but that because they did not affect the integrity or strength of the bridge he did not report it. He stated that he conducts inspections twice a year and said that the one time he was out on the bridge he did not see anyone on or near the bridge.

Ernest Selders, who has worked for the railroad for thirty-one years, stated that he conducted relief track inspections for Joe Curtis from 1991 to 2001. He testified that his job is to look for broken rails, tie conditions, or anything that is found on the railroad tracks. Selders inspected the track twice a week when Curtis was off and on holidays. He also conducted walking inspections of the bridge. Selders testified that he never saw the markings on the bridge. He testified it was common to see people walking by the tracks and that anytime he sees people doing so he tells them to get off the tracks. Selders stated that he only looked at the tracks and that it was not his job to look for graffiti and even if he had seen it, he would not have reported it. Selders testified that he has never seen a pedestrian on the Bayou Nezpique Bridge in the ten years he worked the area. He said that the last time he was on the Bayou Nezpique Bridge was in 2001, some two years before the accident. He testified that he had never seen anyone on or near the bridge.

William Thibodeaux testified that he worked for the railroad for thirty-six years and that when he retired he was the manager of track maintenance. He stated that his job included maintenance and inspection of the area between Basile and Elton, commonly referred to as the Beaumont Subdivision. He said that he supervised the men that performed the repairs and also the inspections. Thibodeaux said that he personally rode the rails at a minimum of twice per month. He testified that the main job of track inspectors is to examine the rails and the cross ties. He testified that he never saw any writing or graffiti on the Bayou Nezpique Bridge structure. He stated that it was the responsibility of all Union Pacific employees to report anyone on railroad property and to ask them to get off and also report it to risk management. Thibodeaux admitted that hunters are a problem for the railroad, but he said that he had never seen anyone on the Bayou Nezpique Bridge. He stated that the normal procedure when seeing someone on Union Pacific property is to report it (by calling) to risk management and instruct the person to get off of the property. He testified that it had never been reported to him by the local police department or anyone else that pedestrians were hanging out on the bridge.

David Rosedale, a senior claims specialist for Union Pacific, testified as to an incident call he received from the critical call center concerning a man on the Bayou Nezpique Bridge. In 2001, a man jumped or fell from the bridge to escape an oncoming train. Apparently, he was hanging from the side of track and let go after the train had passed. Rosedale testified that he did the ground investigation of the accident some two years before the current incident. He stated that he has worked for Union Pacific for thirty-six years and that the Bayou Nezpique Bridge area has been

13

in his territory for twenty to twenty-five years. Rosedale said that this was the only other incident in the twenty plus year period that occurred on that bridge.

Jeremy Ashford testified that he resided a half mile from the Bayou Nezpique Bridge and has lived there for twelve years. He said that he has gone out on the Bridge two to three times a year. He stated that he walked across to the other side. Ashford testified that the last time he was out there was when he was about eighteen years old or nine years ago. He also testified that he has seen other people on the bridge. Jeremy testified that when he was about fourteen, he, his brother, and his cousin were on the tracks when they saw a train headed toward them. He testified that they were able to get off the tracks, but the train did not stop and no one came to question them about the incident. He said this occurred in 1993 or 1994. Jeremy further testified that he has been on the tracks when railroad personnel have walked by and that he would move to the side to let them pass, and he would wave to the workers. He said that there was no doubt that the workers saw him on the railroad's property. He said that no one ever told him to get off the property, but that an employee told him to be careful. Jeremy testified that he did not know the bridge was private property. On cross-examination he admitted that Cade is a good friend of his and that Cade's dad, Franklin Howell, is his godfather.

Jason Ashford, Jeremy's younger brother, testified that he and his brother would play on the bridge and throw rocks in the bayou. He said that he had seen other kids out on the bridge and that he never considered going out on the bridge to be dangerous. However, he admitted that it was more common to go under the bridge rather than on the bridge itself. As to the incident with his brother and cousin,

14

Jason stated that he told his parents and that they said it was dangerous, but he still continued to go on the bridge.

Dustin Ortego, testified that he was twenty-six years old and was Cade's first cousin. Ortego testified that he scratched his name on the bridge with a rock. He stated he was between eight and ten years old when he first went out on the bridge and that he never thought of it as dangerous.

Samuel Bacon testified that he has been out on the bridge with Cade. He said that he last went on the bridge during his senior year of high school. Bacon said it was common to walk around the bridge and throw rocks off of it. He stated that he did not consider it to be dangerous and that he has seen other people on the bridge. However, he testified that he had never seen any railroad personnel on the bridge while he was out there. Bacon said that it was not common to see people on the bridge and that he was aware that the bridge was dangerous. He said that he knew there was a big drop off and that the bridge was clearly an open and obvious danger. Bacon testified that he knew it was private property but said he went on the bridge anyway.

Brenton Andrus, who was twenty-one years old at the time of trial, testified that he grew up in Basile. He said that Cade was his second cousin. Brenton testified that he had been out to the bridge with his dad and his uncle and that they were shooting guns off of the trestle. He testified that one of the white railroad trucks came along so they got off the trestle and walked away. Brenton said that the truck just drove by and did not say anything to them, but that the driver waved to them. On one occasion, Brenton testified that he heard a train approaching while he was on the

15

bridge and was able to get off, but that no one contacted him about being on the railroad's property. He further stated that he was aware of the dangers of being on the bridge, but that he was not really worried. Brenton said that his parents told him not to go out there, but he did anyway. He stated he knew the risks of being caught on the bridge when a train was approaching, but took the risk anyway.

Abel Andrus, who was nineteen years old at the time of trial, stated that he attended church with Cade. Abel said that he would go out on the bridge on Sunday afternoons after church to shoot turtles. He testified that a Union Pacific truck would come by while he was on the tracks, but never stopped to tell him to get off or ask what he was doing. Abel said that he had never been to the bridge alone–only with Cade, who was like a big brother to him. He testified that Cade told him that they had to be careful while on the bridge and to listen out for trains so that they could get off of the bridge in time. Abel said that he had never had any trouble hearing whistles on the bridge and he is deaf in one ear. He further stated that he knew that being on the bridge was unsafe. Finally he testified, that he knew his parents would disapprove of him being on the bridge.

Heather Aucoin, who was thirty-one years old at the time of trial, testified that she had worked for plaintiffs' counsel. She said she lived near the Bayou Nezpique Bridge and that she had seen people walking on the bridge at least ten or twelve times in her life. She said that her father had taken her across the bridge in order to pick berries. Aucoin remembered hearing a train one day when she was pretending to be a gymnast on the rails of the track. She said that she knew the dangers of being on the bridge and that she has told her children that they cannot play

16

on the tracks. Aucoin testified that if one of her children were to be injured she would not blame the railroad because they should not be there.

Montana Howell, who was twenty-five years old at the time of trial, testified that he had been on the bridge and walked the length of the bridge at least once. He admitted that he scratched his name on the bridge. Montana said that he had been on the bridge when a Union Pacific truck came driving down the tracks and that he walked off the bridge. He said the driver of the truck waved, but never instructed him to get off of the railroad's property. Montana described an incident in which he, his brother, and Aucoin, were on the bridge when a train was coming, but that they made it off in time. Montana said that Cade was around four-and-a-half or five years old at the time. He said it scared him but did not stop him from going on the bridge. He further stated that he could not recall his parents telling him not to go on the bridge. Montana testified that a train coming around the curve is an obvious danger, and he agreed that no one should be on the track. He further admitted that he knew that someone could be injured or killed and that he knew that before this accident.

Deputy Earlene Fruge testified that at least once a month he would see people walking across the bridge for the past nine years that he has been patrolling the area. Despite being a Deputy, he testified that he never told any of the numerous people he saw to get off the tracks.

Brandy Laiche, Heather Aucoin's sister, stated that she had been on the Bayou Nezpique Bridge many times growing up. She said that she had been out there with her dad and had walked all the way across the bridge. She said that she has seen

many people walking across the bridge. Laiche said that a truck passed by while they were on the bridge and that no one told her to get off of the bridge, the tracks, or railroad property. She stated that her parents had warned her to not go out on the bridge.

Michael Putnam, Heather and Brandy's dad, testified he has been on the bridge hundreds of times. He said that the bridge was part of his childhood. Putnam testified that he took his daughters across the bridge to pick mayhaw berries. He said that using the bridge was a common occurrence for people in the area. However, he did testify that he always knew the bridge was dangerous and that there was a risk of a train coming. Putnam said that even though he was aware of the risk, he took the risk anyway. Putnam further stated that he told his daughters that they had to have a plan if they were on the trestle and heard a train approaching. He further said that if he were to be injured he would blame no one but himself because he knew he was risking his life. Finally, Putnam testified that in the ten years prior to the accident he had not personally seen anyone on the bridge nor had he ever encountered any railroad personnel, but that they had seen him near the tracks many times.

Cade testified that he saw many people on the tracks. He said that when he saw the Union Pacific trucks he would move to the side, let them pass, and wave and that the driver would wave back at him. However, he stated that he has never spoken to any Union Pacific employee. Cade said as to the actual accident that he never heard anything indicating the train was approaching. He said that he looked up and saw the train's lights. He stated that he was aware the bridge was dangerous although his parents did not stress that too much. He stated that Corey was his best friend and that they would go out by the bridge approximately three times per week. Cade said that no one from the railroad had ever seen him on the bridge or track.

18

Richard Beall, a Railroad Operations and Safety Consultant and a certified Locomotive Engineer, testified that he has been consulting since 1988. He said that he has investigated more than 300 railroad accidents, mostly for plaintiffs. He testified that he has qualified as an expert in Louisiana before. On cross examination, he admitted to being fired twice and receiving demerits. He admitted his rating was the same as Nero or Lazo.

Beall was of the opinion that as soon as you come out of the curve you can see what is on the bridge and that Lazo should have seen that there were people on the bridge. Beall testified that the engineer did not brake sufficiently until thirty seconds after seeing the objects on the track. He said that he did do some minimal service braking, but did not slow the train sufficiently. Beall opined that the train could have been completely stopped before reaching the bridge without putting the train into emergency. It was his opinion that Lazo behaved negligently whether he saw objects or people. Beall further stated that the conductor was also negligent for failing to take the safe course, which is the first rule of the General Code of Operating Rules: "In case of doubt or uncertainty, take the safe course."

Beall stated that Lazo's negligence resulted from the facts that he did not blow the horn as he should, did not do a full service braking immediately, the service braking he did do was inadequate, and that he waited too long to place the train into emergency. On cross, Beall admitted that he had not done a run through or a test drive to reconstruct what the engineer and conductor saw riding in a locomotive at 50 MPH while coming around a curve. He stated that he would have been of the same opinion if he had never gone out to the scene based solely on the data obtained from the event recorder. Beall said that he only went out to the scene a year after being hired. He further testified that he could see a snake from a mile way in the dark and that the engineer and conductor should have seen the boys nearly 4,000 feet

19

away.

Also, although he provided no calculations, Beall stated that he could have stopped this train within 3,000 to 3,200 feet using only full service braking, and without recourse to emergency braking, based on his experience. Beall had previously testified that one does not put the train in emergency every time you see someone on the tracks. He said that the initial reaction is to sound the whistle because you expect people to get of the track. He said he could see people plainly at 3,500 feet coming out of the curve.

James Loumiet testified as an expert accident reconstructionist. In deposition, he stated that the engineer could have stopped short of impact had he stopped within 8.9 seconds of turning the curve rather than the thirty to thirty-one seconds that he delayed before applying the emergency brakes. Loumiet stated that he has never operated a train in his entire life. He further said that there were no issues with the brakes and no indication that there were any errors in the data recorder. He was of the opinion that if Lazo had put the train in emergency at first sight of the boys, rather than blowing the whistle, he would have avoided the impact. Or, if he had applied the emergency brakes within 8.9 seconds of first blowing the whistle, he could have avoided impact. He further opined that if Lazo had instituted a full service brake application within three seconds of blowing the whistle, he could have avoided impact. However, on cross-examination he admitted that application of the full service application would not have stopped the train short of impact based on a starting point of the first real blowing of the horn when the engineer saw the objects on the track.

Dr. Mark Green, a human factors psychologist and an expert in the field of vision, signal detection, perception reaction, and human factors, testified that his work focuses on vision and perception. Dr. Green testified that in his opinion, the

20

photographs taken of the area and from the locomotive were not an accurate representation of what an individual in the actual situation might or might not have seen, due to a variety of things such as the exposure of film and the nature of photographs. He stated that it would be unreliable to depend on the photos to determine what the engineer/conductor could see. He further stated that videos are even more unreliable because the compression of color and brightness is even worse in video than in pictures. Dr. Green opined that the thirty-second delay would not be a reasonable response if Lazo actually identified the kids (as opposed to an object) coming out of the curve. He also testified that familiarity with things that might be considered dangerous lessens a person's ability to recognize that it presents a dangerous situation. Thus, if a person encounters a hazard repeatedly with no ill effects they generally come to believe that there is not much risk.

Dr. Green further testified that he could not comment on Beall's testimony that he could see people from the curve or over 3,000 feet away because there was no scientific way to test if it were true. He admitted that it was very likely that when the train rounded the curve it was easier for the young men to discern the presence of the train than it was for the crew to discern the presence of the young men.

Keir Nero, the conductor of the train at the time of the accident, testified that as of May 2005, he has worked as an engineer. He testified that as the conductor, he was is in charge of the train, which included all of the paperwork, responsibility for any problems they might encounter along the way, any work that is required on the ground, and responsibility for what the engineer is doing–including following and complying with the rules. He said that the conductor is a supervisor of the engineer. The engineer is responsible for moving the train down the track. Nero testified that the video shown of the locomotive traveling through the Barnsdale

21

crossing around the curve and towards and over the bridge was an accurate depiction of the general scenery in the area. He stated that you cannot see the bridge or where it begins when you are in the curve. Nero testified that as they were coming out of the curve, Lazo said that he saw something on the track. Nero said that he also saw something on the tracks, but he could not tell what it was. Nero stated this is when Lazo blew the whistle. Nero said he could not detect any movement and he did not think that the object was a person or people. He stated that he did not feel it was appropriate as the conductor to begin slowing down at that point because it was not in accordance with their training. Nero testified that once they realized there were pedestrians running way from the train they put the train in emergency. He testified that he hollered out of the window for them to jump. He then went on to describe how they hit the boys.

Nero stated the train was carrying hazardous materials, which could pose a risk in case of derailment. He reiterated that he and Lazo blew the horn when they saw it was an object on the track and once they realized there were people, they put the train into emergency, which was about thirty seconds after initially blowing the horn or a quarter of a mile further down the track. Nero basically said that as soon as they realized there were people on the tracks, they put the train into emergency. He stated that he agreed with everything the engineer did then, and he still does to this day.

James L. Breeden, the general manager of operating practices for Union Pacific and also a designated supervisor of locomotive engineers, testified that he has worked for the railroad for twenty-eight years. He testified that his duties include rules, compliance of train and engine persons, as well as abiding by rules, the air brake train handling rules, G-Core, compliance with hazardous material train handling instructions, and other train handling issues. Breeden said that he ran trains

22

over the Bayou Nezpique Bridge area during the 1995-2000 period and that he has never seen any pedestrians on or near the bridge. He stated that he operated a locomotive through the area following the accident and that you cannot see the steel trestle nor can you tell where the bridge begins as you come out of the curve even though you might conceptually know that it is there. He further stated that it was his opinion that a person could not identify an object on the bridge from over 3,000 feet away. Breeden testified that an engineer's obligation when seeing an unidentified object on the track would be to sound the horn in warning and then determine if there was any movement. He stated that it was his experience that people move out of the way when the horn is sounded. He further stated he would not expect an engineer to engage in immediate braking upon seeing an unidentified object on a bridge. Breeden stated he would expect an engineer to continue blowing the horn and observing and to go from there.

Breeden further testified that he disagreed with Beall and that his testimony would not apply to freight trains. He stated it may have been accurate for smaller and lighter passenger trains, but not freight trains. Breeden said that he was of the opinion that full service breaking of the train as it rounded the corner would not have avoided impact. He stated that with this type of train it would take at least 6,400 feet before the train would have stopped. He further stated that it would take even longer with an incremental service brake. Breeden said that once pedestrians are identified, it would be inappropriate action to use any type of braking other than the emergency application. He stated that, as a rule of thumb, service braking will take twice as long as emergency braking. Breeden went on to testify that the engineer and conductor did not violate any of Union Pacific's rules or training.

Finally, Breeden was asked to recite a section of Loumiet's book entitled "Pedestrians and Pedestrian-Accident Countermeasures" in which Loumiet states:

23

> *Use of train horn*-In spite of the fact that pedestrians should not be on railroad tracks, the fact is that they often are on the tracks. Hence, whenever a train approaches pedestrians on or near tracks, the crew should sound the horn in order to give the pedestrian every opportunity to take appropriate action. In the case of trestles, where a pedestrian may have to travel literally hundreds of feet to reach a point of safety, the horn should be sounded as soon as possible to give the pedestrian as much time as possible to leave the trestle. One possibility is for trains to sound their horn at some designated location (e.g. 1/4 mile) in advance of long trestles, trestles that are known to be used frequently by pedestrians, or trestles that have an accident history. Of course, the option is always available to railroad to sound the horn in advance of all trestles.

He stated that the there is no doubt that the engineer complied with these rules as set forth in Loumiet's own book.

Dr. William Fogarty, an expert in accident reconstruction including human factors, testified that he was able to ride thru the area beginning at the curve on a locomotive. Dr. Fogarty then discussed in detail reaction times in the boys and what may have caused them to be inattentive to the train whistle. He went on to state that at 3,000 feet away a six-foot-tall person would appear to be the size of the period at the end of the sentence using a font size of twelve. So, that far away the only thing you see is a dot. Dr. Fogarty then discussed a video animation showing an aerial overview of the train's location starting before the Barnsdale crossing and showing the moments when the horn was blown, service application was begun, and emergency braking began. He was of the opinion that it was reasonable for the conductor and/or engineer to identify the boys as pedestrians at about a quarter of a mile away, which is when they put the train in emergency. He further opined that the boys had more than a reasonable opportunity to avoid the event that took place by sight or sound. He testified that the engineer and conductor did not have the same opportunity to avoid the accident as the boys did because they did not have a signal that came back to them in the form of the boys' creating movement. Finally, he stated that his opinions are based on reasonable scientific certainty.

24

*Liability of Lazo/Nero*

The plaintiffs argue that the jury had no reasonable factual basis for finding that Lazo and Nero were not negligent. We disagree. Clearly, the jury believed Lazo's testimony that he saw objects on the track, blew his whistle, realized it was kids running away from train, and put the train into emergency in order to stop it. The evidence shows that from the initial horn blowing to the point at which Lazo/Nero put the train into emergency thirty seconds elapsed. We find no error in the jury's finding that this behavior did not constitute negligence. The jury believed that Lazo/Nero put the train into emergency as soon as they identified that there were boys running away from the train. This factual finding cannot be manifestly erroneous if the finding is reasonable in light of a review of the entire record. We find that it is. In their brief, the plaintiffs' stress that Lazo "saw kids" on the bridge at the time he first blew his horn and should have put the train into emergency at that time. This is based primarily on a statement that he gave shortly after the accident in which he wrote, "Coming around a curve, saw kids on bridge, started blowing horn, set train on emergency." We do not find this statement, made shortly following the accident, to be determinative of the actual course of events that day. There was expert evidence to support the findings, that at more than 3,500 feet away, Lazo could only identify the boys as "objects" rather than as people. Moreover, even if he had identified, initially, that it was human beings, rather than objects, his only duty would have been to blow the whistle. The duty of an engineer when spotting pedestrians on a train track or bridge does not extend to placing the train into emergency immediately because it is presumed that the pedestrian will depart from where he should not have been in the first place. Accordingly, we find no error in the trial court's determination that neither the conductor nor the engineer of the train was negligent in their operation of this train.

*Liability of Union Pacific*

The plaintiffs contend that it was not reasonable for the jury to find a lack of negligence on part of the railroad because it is negligence to have a policy that does not require the engineer to immediately slow down or stop a train anytime he sees any object on a track, particularly an object on a trestle with no escape route. We find no manifest error in the jury's finding that Union Pacific was not negligent. It would be unduly burdensome on the railroad to require that they slow down or stop a train anytime the engineer sees any object on the track. One does not expect reasonable people to be hanging out on the trestle of a railroad track. And if they are, one expects them to move when hearing an approaching train. We find that the jury could have found that it is a reasonable company policy to begin to stop the train only when it is determined that lives are in peril, as the engineer did in this case.

Next, the plaintiffs' urge that Union Pacific was negligent in failing to report pedestrian activity. We find it was not unreasonable for the jury to find that the railroad did not have any notice of substantial pedestrian activity. Multiple witnesses testified that they had never seen anyone on the Bayou Nezpique Bridge. On the other hand, other witnesses said it was quite common to walk on the tracks, and, occasionally, across the bridge. The plaintiffs heavily rely upon photos of some "graffiti" as proof that the railroad should have had notice of the pedestrian activity. The "graffiti" is quite minor and appears on a steel support beam of the track. The photos reveal that it is quite dated and insignificant. Additionally, the plaintiffs claim that it was negligence on the part of Union Pacific to not inform its engineers and conductors of the 2001 incident on the bridge. The plaintiffs argue that had the engineer known about this previous incident, he may have immediately put the train into emergency upon seeing the "objects" on the track, thus possibly stopping short of impacting the boys. As we have previously stated, a train has no duty to stop for

26

every "object" it sees on its tracks. Again, we cannot say that the jury was manifestly erroneous in finding that Union Pacific was not negligent.

*Liability of Curtis, Selders, Thibodeaux*

The plaintiffs set forth a similar argument regarding these three Union Pacific employees urging that it was manifest error for the jury to find that they were not negligent in failing to report pedestrian activity on the bridge. For the same reasons mentioned above, we find this assignment of error without merit.

## POST TRIAL MOTIONS

In this assignment of error the plaintiffs urge that the trial court erred in denying their motion for JNOV and/or New Trial. Based on our foregoing findings, we find that this assignment of error is without merit.

## COMPARATIVE FAULT/DAMAGES

Although not listed as an assignment of error, the plaintiffs (in the body of their brief) set forth issues eight and nine pertaining to the comparative fault of the boys and the damages. Because we have found no error in the jury's finding that Union Pacific or its employees were not negligent, we need not address these issues.

## CONCLUSION

The jury's verdict in favor of the defendant-appellee's, Union Pacific Railroad Company, Ernest Selders, Jr., Joseph Wayne Curtis, William J. Thibodeaux, Armando Lazo, and Keir N. Nero, is affirmed. All costs of this appeal are assessed against the plaintiffs-appellants, Cade Harper Howell, James and Lynne Howell, Dwayne and Patricia Smith, and Frederick and Jeannette Young.

**AFFIRMED**.

27